JENDRUS v. DETROIT STEEL PRODUCTS CO.

MASTER AND SERVANT—PERSONAL INJURIES—WORKMEN'S COMPEN-
SATION ACT—REFUSAL TO ALLOW OPERATION.

Where a servant of. defendant received internal injuries
which resulted in peritonitis and he refused to permit an
operation which his physician advised, until his condition
became too serious to operate successfully, but it was not
established conclusively that an operation would have
effected a cure or that the peritonitis caused his death,
and where it was shown that decedent probably died of
pneumonia contracted as a result of the operation when
he finally submitted to it, 15 or 16 hours later, the court
could not determine, as matter of law, that his conduct
was so unreasonable as to forfeit the right to compensa-
tion under Act No. 10, First Special Session 1912 (2 How.
Stat. [2d Ed.] § 3939), especially in view of the fact that
he was unable to speak or understand English well, and
was suffering at the time the operation was proposed.

Certiorari to the industrial accident board. Sub-
mitted October 16, 1913. (Docket No. 52.) Decided
December 20, 1913.

Helen Jendrus presented her claim to the industrial
accident board for compensation for the accidental
death of her husband while he was employed by the
Detroit Steel Products Company. From the allow-
ance of the claim, defendants bring certiorari. Af-
firmed.

*Beaumont, Smith & Harris,* for appellants.

*William W. MacPherson,* for appellee.

STONE, J.   The claimant and appellee is the widow
of Joseph Jendrus, who died on February 19, 1913.
Joseph Jendrus, a native of Poland, was on February
14, 1913, an employee of the appellant Detroit Steel

Products Company, which was then insured under the workmen's compensation act by the appellant Michigan Workmen's Compensation Mutual Insurance Company. Joseph Jendrus was at the date last named also subject to the compensation act. On Friday, February 14, 1913, at about 2 o'clock in the afternoon, Jendrus, while in good health and vigor, was at work for his said employer polishing a spring scroll, when the end of the scroll caught on a belt of a machine, and swung around and struck him violently in the abdomen. Jendrus was immediately placed on a stretcher and sent to Harper Hospital. The insurance company was notified, and its surgeon, Dr. W. H. Hutchings, reached the hospital before the ambulance arrived. He looked at Jendrus before he was taken into the hospital. Before Jendrus was taken into the ward, samples of his urine and his blood were taken, and he was then put to bed. As soon as this was done, the surgeon examined him, and found "a tenderness, very slight, almost no sign of contusion on the outside, just a little redness." This was on the right side between the ribs and the hip. This was at 2 p. m. A delay was necessary for the blood examination. At 4 o'clock Dr. Hutchings saw Jendrus again. He then complained of much pain, and there was marked muscular rigidity over the area where the blow appeared to have struck. At 8 o'clock p. m. another examination was made. The area of hardness was then spreading. The blood examination had shown no internal hemorrhage, the urine no blood, and the surgeon, with this information, diagnosed the case as that of a ruptured intestine. At this hour Jendrus' temperature was rising. The surgeon, to confirm his diagnosis, asked Drs. George McKean and Angus McLean to see the injured man. They each examined him at about 8 o'clock, and confirmed Dr. Hutchings' opinion, and they joined him in saying that an immediate operation was necessary. At this time the

claimant and an elderly man were at the bedside of the patient. Jendrus spoke very little English and Dr. Hutchings could not speak Polish. He and the man spoke German, and the doctor explained to him the necessity for an operation. Upon this subject Dr. Hutchings testified before the committee of arbitration as follows:

"I told him that if my diagnosis was correct, that without an operation he was, in my opinion, sure to die; that if he was operated on at that time, he had about nine chances out of ten of getting well. I thoroughly explained that the longer he delayed the operation, the so much worse it was for his chances; that if he delayed long enough, there would be no use of operating. Dr. McLean and Dr. McKean said the same thing. I was not satisfied from the attitude of the man I talked with that he had told him what I said. I was not sure that he did. So I sent down and got one of the maids there who spoke English very well, and who is Polish also, called her in and said to her, 'I want you to tell this man what I say to you.' This was around 8 o'clock. 'You tell him that, if our diagnosis is correct, that if he is not operated on, he will surely die.' I said, 'If you are operated on now, as soon as we can, your chances of getting well are about nine out of ten; the longer you delay this, so much you take away from your chances of recovery; if you delay it until you are pretty near dead, probably an operation will do you no good.' This Polish girl explained this to the man, and he said, 'No.' I could see him shake his head. It was apparent from his general attitude that he would not have it, so I went away. * * * I went away leaving instructions, if they changed their minds, they were to call me."

While the doctors were there in consultation, the patient vomited a little fluid. Dr. McLean testified:

"It was fecal in odor, but was not of a poisonous nature."

Dr. McKean testified:

"It was almost a fecal vomit, due to reverse acting

of the peritalsis. It was just the beginning of peritonitis. * * * It was approaching the fecal vomiting time."

The patient was kept quiet during the night. The next morning when Dr. Hutchings again saw him he was worse. The doctor testified:

"His pulse was rapid, the whole abdomen was distended and tender, and the typical signs of advanced peritonitis; that is, he was vomiting considerable quantities of fecal matter, which by that time had become markedly fecal."

The patient would not consent in the morning to an operation. Dr. Hutchings went to attend to some other operations. Between 11:30 a. m. and 12 o'clock another physician had been called by the Jendrus family, and he testified that when he arrived Jendrus had consented to be operated upon. Dr. Hutchings testified that it was about 12:30 p. m. when he was told by the nurse that Jendrus had consented to an operation. A room was ordered prepared, and the patient was operated upon at 1:30 p. m. This was as soon as the arrangements could be made. The house staff was present and assisted. There was testimony that the vomiting had grown worse, and it had been persistent all the morning, and the distended condition of the abdomen had developed about 9 o'clock. Because of the vomiting Dr. Hutchings directed the assistants to use nitrous oxide as the anæsthetic as being less likely to produce vomiting. Just as the patient was going under the influence of the anæsthetic a large quantity of fecal vomitus came up, and some of it went down in his lungs. They turned his head over in the endeavor to rid him of this. The surgeon testified that there was no way that this vomitus getting into the lungs could be avoided. Dr. Hutchings proceeded with the operation, which took about ten minutes. He made the ordinary incision and found a com-

plete peritonitis. The intestines were so congested that he did not attempt to remove them and find the perforation. He inserted drainage in the abdomen, and began transfusing a salt solution subcutaneously. Following the operation Jendrus' condition improved. His temperature went down; the vomiting became less, but his breathing remained rapid. There was trouble about washing out his stomach. He had refused to have this done, but finally consented.

Two days after the operation pneumonia developed, and Dr. Ernest Haass was called. He found the patient suffering from aspiration, or "swallow" pneumonia. This was on Monday. The next two days the lungs solidified, and the patient died of pneumonia, in the opinion of most of the physicians. Dr. McLean, however, testified that, while he saw him but a few times, he did not think he died of pneumonia; he thought it was the peritonitis that was the cause of his death, but testified that he did not see the patient after he had pneumonia. After Jendrus' death a *post mortem* was performed by Dr. Sill, and it confirmed the diagnosis of the surgeon. The lungs were found to be solidified, and Dr. Sill testified, among other things, as follows:

"I think that the pneumonia process discovered was as potent a factor in causing the death as the peritonitis. I would call that what we term the immediate cause of death.

"*Q.* Was there any way for you to determine whether or not the pneumonia was caused by inspiration of material, of vomitus?

"*A.* Simply that it was a disseminated bronchial pneumonia. * * * The pneumonia process was still active. I mean that the inflammation was going on. I think the man died from toxæmia. I hold from my *post mortem* findings that the pneumonia process was the most active toxic process going on at the time of his death. I form that opinion from the fact that the peritonitis was beginning to localize, beginning to subside. I do not think I could say that the pneu-

monia was sufficient to have caused death without the complicated inflammation of the peritonitis. The peritonitis and the pneumonia together were sufficient to cause death; but whether the pneumonia alone would have caused death I could not answer. * * * I think the pneumonia was the immediate cause of death. If he had not had pneumonia, he would not have died when he did die, and he might ·have recovered from his peritonitis.

"Q. Nothing certain about that, about him recovering from the peritonitis?

"A. I could not swear that he would recover; no.

"Q. Are you able to tell from your *post mortem* findings, or are you able to state, which was the greatest factor in his death production, eliminating the fact that his pneumonia came, as stated by Dr. Hutchings, from the inspiration of material vomited?

"A. No; I don't think I can state that. I don't think I can state which was the greatest factor in his death, eliminating the fact that his pneumonia came from inspiration of material vomited."

The perforation of the intestine was located at the *post mortem*. On separating the coils of the intestines a perforation the size of a Canadian five-cent piece was found in the ileum 2½ feet from the *caput coli*. None of the physicians testified that Jendrus would surely have recovered from the operation if it had been performed Friday night; but there was testimony that an early operation presented the only chance for saving his life.

After the death of Jendrus the claimant here made claim for compensation. A committee of arbitration was appointed, testimony taken, and the award was in favor of the claimant for the sum of $10 per week for a period of 300 weeks from the 14th day of February, 1913.

Thereafter a review of this award was had, and the industrial accident board affirmed it, filing an opinion and finding of facts, as follows:

"In this case the deceased, Joseph Jendrus, was in-

jured by a severe blow on the abdomen. The doctors attending the injured man diagnosed the injury as a probable rupture of the intestine, and advised an operation. The accident occurred about 1 o'clock in the afternoon on February 14th. At about 8 or 8:30 in the evening the doctors sought to operate on the injured man. It appears that he could not talk English, and communication was had with him through an interpreter. The injured man shook his head, indicating a refusal to be operated on. The matter of an operation was again brought up by the doctors on the following morning, February 15th. Jendrus, at that time, refused to submit to the operation, but consented at about 11:30 a. m. The operation was performed about 1:30 p. m. on February 15th. It seems that during the operation the patient vomited, and the vomit was drawn into the lungs, causing pneumonia, and resulting in his death a few days later. The operation disclosed a rupture of the intestines which was not sutured, and the *post mortem* examination showed the same to be in process of healing at the time of death. All communication with the deceased after the injury was through an interpreter. The board is of the opinion that the refusal to be operated on when first requested and the further action of deceased in delaying consent to the operation until nearly noon on the day following the accident was not so unreasonable and persistent as to defeat the claim for compensation in this case. He did submit to the operation after being convinced that it was absolutely necessary. It seems that nearly two hours elapsed from the time he gave this consent until the operation was performed. It is by no means certain that an earlier operation would have saved his life, nor is it certain that the operation actually performed would not have resulted in his recovery were it not for the fact that he vomited while under the anæsthetic, and inhaled some of the vomit, causing pneumonia. It seems clear that the operation was not too late to remedy the abdominal injury caused by the accident. The vomiting and resulting pneumonia came as an incident to the operation. The fact that the deceased was unable to speak English and was unaccustomed to the ways of this country should be

given some weight. The judgment and decision of the arbitration committee is affirmed."

There was a motion to amend the findings, which was refused except in one instance, to which action there was no exception or error assigned, and the matter of refusal to amend is not before us.

The case is here upon certiorari to review the action of the industrial accident board.

The following grounds of error are assigned by appellants in the affidavit for the writ of certiorari:

*(a)* "The industrial accident board erred in affirming the said judgment and decision of the said arbitration committee."

*(b)* "The industrial accident board erred in deciding that the refusal of said Joseph Jendrus to be operated on when first requested and further action of the deceased in delaying consent to the operation was not so unreasonable and persistent as to defeat the claim for compensation."

*(c)* "The said industrial accident board erred in holding that the refusal of the said Joseph Jendrus to be operated on was not so unreasonable as to defeat the claim for compensation."

*(d)* "Said industrial accident board erred in deciding that the refusal of the said Joseph Jendrus was not so persistent as to defeat the claim for compensation in that the refusal to submit to an operation if unreasonable need not be persistent to defeat the claim for compensation."

*(e)* "Said industrial accident board likewise erred in their conclusion of law that the said refusal was not so persistent as to defeat the claim for compensation in that, as a matter of law, the said refusal need not be persistent to defeat said claim."

*(f)* "Said industrial accident board erred in its conclusion of law that the said refusal was not unreasonable."

*(g)* "That said industrial accident board erred in their decision, because it appears from the testimony that the said Joseph Jendrus did not come to his death as a result of the said injury for which compensation was claimed, but he came to his death by reason of

his refusal to permit the medical attention offered him by said respondents, Michigan Workmen's Compensation Mutual Insurance Company and the Detroit Steel Products Company."

*(h)* "The said industrial accident board erred in holding, as a matter of law, that the death of the said deceased was not a result of his intentional and wilful misconduct."

*(i)* "The industrial accident board erred in holding, as a matter of law, that the claimant was entitled to compensation as widow of the said Joseph Jendrus; he having refused to consent to the medical attendance offered by the said employer, the Detroit Steel Products Company and the Michigan Workmen's Compensation Mutual Insurance Company, petitioners herein."

Section 12 of part 3 of the act (Act No. 10, Pub. Acts 1912) provides that the finding of fact made by the said industrial accident board, acting within its powers, shall, in the absence of fraud, be conclusive, but the Supreme Court shall have power to review questions of law involved in any final determination of said industrial accident board. No question is raised in this case involving the validity or constitutionality of the act in question. No claim of fraud is here presented.

The appellants state in their brief that the questions involved are:

(1) Did the injury arise out of and in the course of the employment?

(2) Was the employee guilty of intentional misconduct?

It is said that these questions are closely related, since it is clear that, if the employee had been guilty of intentional and wilful misconduct, he could not be acting within the course of his employment. We quote from appellants' brief as follows:

"Manifestly, the original injury—the striking of the spring against the abdomen of Jendrus—arose in

178 MICH.—18.

the course of the employment, and arose out of the employment, and there is no showing that it was caused by the wilful misconduct of Jendrus. But the claim here is for compensation by reason of the death of Jendrus. The question then is, did the death occur from that injury, or was it caused by some other accident, act, or injury? * * * Here Jendrus had entered into an agreement by which he had undertaken to accept from his employer reasonable medical treatment and hospital services. The employer had undertaken that for a limited period of time it would furnish this service. That agreement was offered to the employee as a part consideration for his yielding up his right of action at common law. But it rests as well upon another theory, which is that the employer, by reason of the fact that it undertook to pay the injured employee a percentage of his earnings during the period of his disability, should have the right, as it was its duty, to furnish the medical attendance to that employee in order to minimize the injury and the consequent compensation."

"When, therefore, Jendrus refused the medical attendance offered by his employer, he refused that which the employer had undertaken to give him, and he refused a service that it was important for the employer to render by reason of the relation which it bore to the compensation that the employer must pay for disability or death. * * * The workmen's compensation statute specifically provides that the injury must arise out of the employment, and specifically negatives a recovery where there is intentional and wilful misconduct. It is true that the statute disregards negligence; but there still must remain, before there can be a recovery, a showing that the injury did result from an accident arising out of the employment, and not from any other cause."

"It would be a harsh rule that bound an employee who had been injured to accept in all cases the dictum of a surgeon who advises an operation. Manifestly the employee cannot be called upon at all times and under all circumstances to place himself absolutely in the hands of the employer's surgeon; but, where there is no dispute amongst his medical advisers, and the course suggested presents the only opportunity for the saving of the life, we insist that that refusal is

a new and controlling cause for the injury for which recovery is sought."

Counsel for appellants call attention to the English act which provides, as ours does, for the payment for injuries arising out of and in the course of the employment, but that that act does not provide for medical care by the employer; and it is urged that in Michigan, if the employee refuses the reasonable medical services tendered by the employer, he is refusing compensation, and should not be permitted to compel the employer to pay the money compensation, while, at the same time, he is refusing to accept the medical compensation. It is urged that under the English decisions the rule has been universally laid down that, if the employee unreasonably refuses to accept the medical attention offered by the employer, he forfeits his compensation. And our attention has been called to the following English cases: *Donnelly* v. *Baird & Co., Ltd.* (Court of Sessions, Scotland, 1908), reported in 45 Scottish Law Reporter, 394; 1 Butterworths' Workmen's Compensation Cases, 95.

In that case a workman in the course of his employment had suffered injury to his left hand, in respect of which he was receiving compensation. On application by the employers to stop the payment of compensation on the ground that the continued incapacity for work resulted from the workman refusing to undergo surgical treatment, the sheriff's substitute found that the operations suggested by the doctors were simple or minor operations, not attended with appreciable risk or serious pain, likely, if submitted to, to restore the workman's capacity for work, and that the workman was of good constitution and sound general health; he thereupon ended the payment of compensation. The court of sessions, two justices dissenting, held that upon the findings of the sheriff's substitute his decision was right.

In the course of his opinion, Lord Justice-Clerk said:

"The question whether a refusal to submit to skilled treatment for the restoration, whole or partial, of capacity for work is an unreasonable refusal, is necessarily a question of degree. For it cannot be maintained that no matter what be the severity of the operation recommended, or how great soever the risk to life or general health of the treatment, the workman loses right to compensation unless he brings himself to undergo the treatment and to take the risk. I think the sound view on this matter is well expressed by Lord Adam in the case of *Dowds* v. *Bennie & Son* [40 S. L. R. 239], when he laid it down that a workman who has been incapacitated is not bound in every case to submit to any medical or surgical treatment that is proposed, under the penalty, if he refuses, of forfeiture of his right to a weekly payment—*e. g.*, in the case where a serious surgical operation is proposed with more or less probability of a successful cure.

"On the other hand, I hold it to be the duty of the injured workman to submit to such treatment, medical or surgical, as involves no serious risk or suffering, such an operation as a man of ordinarily manly character would undergo for his own good, in a case where no question of compensation due by another existed. In preparing this opinion I find that I have used almost the terms which are to be found in the case of *Anderson* v. *Baird & Co., Ltd.* [40 S. L. R. 263]. These two cases which I have referred to seem to me to practically rule this case."

Lord McLaren said:

"There is of course no question of compelling the party to submit to an operation. The question is whether a party who declines to undergo what would be described by experts as a reasonable and safe operation is to be considered as a sufferer from the effect of an injury received in the course of his employment, or whether his suffering and consequent inability to work at his trade ought not to be attributed to his voluntary action in declining to avail himself of reasonable surgical treatment.

"In order to test the principle of decision I will suppose a more simple case. A workman whose trade requires the perfect use of both hands—a watchmaker or an instrument-maker for example—has the misfortune to break one of the bones of a finger, and from want of immediate assistance, or it may be from neglect, the bone does not unite in the proper way. The hand is disabled, but he is advised that by breaking the bone at the old fracture and resetting it the use of his hand will be completely restored. I am supposing a case where the operation is not attended with risk to health or unusual suffering, and where the recovery of the use of the hand is reasonably clear. If in such a case the sufferer, either from defect of moral courage, or because he is content with a disabled hand and is willing to live on the pittance which he is receiving under the compensation act, refuses to be operated on, I should have no difficulty in holding that his continued inability to work at his trade was the result of the refusal of remedial treatment, and that he was not entitled to further compensation.

"Passing to the other extreme, it is easy to figure a case of internal injury where an operation if successful would restore the sufferer to health, but where the surgeon was bound to admit that the operation was attended with danger. In such a case it would be generally admitted that there was not only a legal but a moral right of election on the part of the injured person; and if he preferred to remain in his disabled condition rather than incur the risk of more serious disablement or death, it could not be said that his inaction disentitled him to further compensation.

"In view of the great diversity of cases raising this question, I can see no general principle except this, that if the operation is not attended with danger to life or health, or extraordinary suffering, and if according to the best medical or surgical opinion the operation offers a reasonable prospect of restoration or relief from the incapacity from which the workman is suffering, then he must either submit to the operation or release his employers from the obligation to maintain him. In other words, the statutory obligation of the employer to give maintenance during the period of incapacity resulting from an accident, is subject to the implied condition that the workman

shall avail himself of such reasonable remedial measures as are within his power."

Our attention is also directed to the case of *Warncken* v. *Moreland & Son, Ltd.* (Court of Appeal, England, 1908),100 Law Times, 12, 2 B. W. C. C. 350. There it was held that, where a workman was injured by an accident in respect of which he was otherwise entitled to receive compensation, and refused to submit to a surgical operation of a simple character involving no serious risk to life or health, and which, according to the unanimous professional evidence, offered a reasonable prospect of the removal of the incapacity from which he suffered, that under those circumstances he had debarred himself from any right to claim further compensation under the act for his continued disability, as such continuance was not attributable to the original accident, but to his unreasonable refusal to avail himself of surgical treatment. In that case the claimant had injured his foot and had had two toes removed. He still suffered pain, and the X-rays showed that a piece of bone was loose in the big toe. The doctors advised an operation; but the man refused. Moulton, L. J., said:

"To hold the contrary would lead to this result, that a workman who had an injury, however small, might refuse to allow it to be dressed and let a trivial burn, say, become a sloughing sore, and lead to partial or total incapacity. * * * The distinction is between being reasonable and not being reasonable."

This case was followed by the case of *Tutton* v. *Owners of Steamship Majestic* (Court of Appeal, 1909), 100 L. T. 644, 2 B. W. C. C. 346. It was there held that a workman injured by an accident arising out of and in the course of his employment within the meaning of the act, who refuses, on the advice of his own doctor, to submit to the surgical operation which, in the opinion of such medical man, involved some risk

to his life, is not acting unreasonably in such refusal, and is not thereby precluded from claiming compensation from his employer under the act in respect of his continued disability to work.   There the court said:

"The test is not really whether on the balance of medical opinion the operation is one which might reasonably be performed.   The test is whether the workman in refusing to undergo the surgical operation acted unreasonably.   I altogether decline to say that, in a case of an operation of this kind, a workman can be said to act unreasonably in following the advice of an unimpeached and competent doctor, even though on the balance of medical evidence given at a subsequent date the learned county court judge might hold that the operation was in its nature one which might reasonably and properly be performed."

Here the applicant was a sailor on board the steamship Majestic, and met with an accident which resulted in double rupture.   He went to the hospital at Southampton, where the doctor advised an operation. The applicant then consulted another surgeon, who advised him not to undergo an operation, as he was suffering from Bright's disease of the kidneys, which would, in his opinion, render it dangerous for him to have an anæsthetic administered; the physician saying that it would be barbarous for him to undergo an operation without an anæsthetic.   With kidney disease an anæsthetic would be a risk to his life.

The appellee has called our attention to the case of *Marshall* v. *Navigation Co.* (1910), 1 K. B. Div. 79, to the effect that, where an injured party refuses to undergo a surgical operation, the employer has the burden of showing that the operation would have accomplished its purpose.

Attention is also called by appellee to the case of *Proprietors of Hays' Wharf, Ltd.,* v. *Brown,* 3 B. W. C. C. 84, to the effect that the burden is upon the em-

ployer to show that the refusal of the workman was unreasonable.

In none of the cases cited by appellants' counsel was the operation anything more than a minor operation for a trifling injury. We think the cases clearly distinguishable from the instant case, which involved a major operation of a serious nature. None of the testimony in the case goes to the length of showing that Jendrus' life would have been saved had the operation been submitted to at 8 o'clock on the evening of February 14th, which was the first time that Dr. Hutchings had reached the conclusion that an operation was necessary. Peritonitis had already set in, and the vomiting had commenced, and vomitus of a fecal nature was then being expelled. That it was the injury which caused the peritonitis is not questioned; that it was the peritonitis which caused the vomiting of fecal matter is not questioned; that it was the taking of fecal matter into the lungs which caused the pneumonia is claimed by all of the surgeons who testified. There is testimony that he might have recovered without any operation, although that result could not have been reasonably expected.

Under all the circumstances of the case, including the fact that Jendrus was a foreigner, unable to speak or understand the English language, that he was suffering great pain on the evening of the 14th, that he was unacquainted with his surroundings, and that he did consent to, and did submit to, an operation within 15 or 16 hours after it was first found necessary, in the judgment of the surgeons, we cannot hold, as matter of law, that the conduct of Jendrus was so unreasonable and persistent as to defeat the claim for compensation by his widow. Neither can we hold that Jendrus by his conduct in the premises in causing a delay in the operation was guilty of intentional and wilful misconduct. We cannot say, as matter of law, that the industrial accident board erred in its conclu-

sions of law in affirming the action of the committee on arbitration.   No other questions of law are presented by the record.

The judgment and decision of the said board is therefore affirmed, with costs against appellants.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, KUHN, OSTRANDER, and BIRD, JJ., concurred.