PONIATOWSKI *v.* STICKLEY BROS. CO.·

MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—EVIDENCE —REFUSAL OF TREATMENT FOR INJURY.

In proceedings to review an award of compensation to claimant by the industrial accident board, under the workmen's compensation law (Act No. 10, Extra Session 1912), for the loss of a toe, where it does not appear that claimant, who was a foreigner, understood when he was to come back to the doctor for treatment, or the importance of coming back for further treatment, or that if he had received further treatment he would have escaped infection and the need of having the toe amputated, the award will not be reversed on the ground that he refused treatment provided by the master.[1]

Certiorari to Industrial Accident Board. Submitted October 12, 1916. (Docket No. 141.) Decided December 22, 1916.

Jacob Poniatowski presented his claim against Stickley Bros. Company for compensation for injuries while

---

[1] On application and effect of workmen's compensation act, generally, see note on the different phases of the question, in L. R. A. 1916A, 23.

in respondent's employ. From an order awarding compensation, respondent brings certiorari. Affirmed.

*Francis X. Campau,* for appellant.

MOORE, J. This proceeding is brought to review an award made to the claimant of $5.40 a week for 10 weeks.

Jacob Poniatowski, while employed by the Stickley Bros. Company, April 8, 1913, had his foot crushed by a lever on the machine he was operating. At the direction of the Stickley Bros. Company Poniatowski went to Dr. Smith's office, where he was treated by Dr. Hodgen. The foot was dressed by Dr. Hodgen, and the man was directed to return to the doctor's office, the doctor testified, on the following day. The plaintiff says on the following Monday. The claimant did not return to the doctor's office. On May 3, 1913, he was called to claimant's house. After treating the toe for about a week the doctor found it necessary to remove the toe. We quote from the brief of appellant's counsel:

"It is the respondent's intention to present to the court a simple case of a man slightly injured who has been offered reasonable adequate medical aid, which would beyond a reasonable doubt have resulted in a cure, without pain or suffering to the injured man, which aid the claimant has refused for no good or sufficient reason. This refusal brought upon the claimant a serious injury. The facts are beyond dispute. The employment, the wage, and the fact that the toe in the first instance was bruised in the course of his duty and in an accident arising out of the employment are admitted. It is also admitted that the amputation was a reasonable and necessary remedy after the infection had developed. The respondent contends that the injury, that is to say the infection, the amputation, and the consequent disability are disassociated from the accident by a break in the causal connection, and that therefore the injury and the consequent disability

did not result from an accident which occurred in the course of the employment of the applicant, and which did not arise out of such employment; but that the injury was rather the result of the applicant's own unreasonable conduct, for which the respondent should not be held responsible."

Counsel cite *Donnelly* v. *Baird & Co.*, 45 Scottish Law Rep. 394, 1 B. W. C. C. 95; *Warncken* v. *Moreland & Son*, 100 Law Times, 12, 2 B. W. C. C. 350; *Jendrus* v. *Detroit Steel Products Co.*, 178 Mich. 265 (144 N. W. 563, L. R. A. 1916A, 381, Am. & Eng. Ann. Cas. 1915D, 476). We are not favored by a brief on the part of the appellee. We do not think the case is as simple as counsel indicate. The plaintiff testified through an interpreter. After he described the injury and his visit to the doctor the following appears in his testimony:

"*Q*. When did you go back to work after you saw the doctor?

"*A*. He went to work on Monday after he had seen the doctor.

"*Q*. When did he see the doctor?

"*A*. On Friday following the accident.

"*Q*. Did the doctor tell you to go home and get some liniment or some medicine of any kind for that toe?

"*A*. No; he did not, he only told him to wash it with soap and water.

"*Q*. Did the doctor ask you to come again?

"*A*. The doctor told him to come again, but the family was in need, and he went back to work.

"*Q*. When did the doctor tell him to come back?

"*A*. He told him to come on the third day, three days later.

"*Q*. Would that be Monday?

"*A*. Monday.

"*Q*. How long did you work when you started to work Monday, how many days?

"*A*. He worked about a week or a week and a half.

"*Q*. Did you do anything for the toe, for the injured toe, while you were working?

"*A*. He washed it in the morning and in the evening

with soap and water and bandaged it, and that was all he did."

The doctor was sworn as a witness. This appears in his testimony:

"*Q.* If a daily treatment thereafter, a treatment as you recommended had been given, you could not say it would positively and assuredly have prevented an infection? What I mean to say is, if you had the care of the foot from the time of this abrasion, could you have prevented an external infection by antiseptics and bandages?

"*A.* Nearly all the time, yes; in 99 cases out of 100, yes."

But the following also appears in his testimony:

"*Q.* Now I want to ask you as an expert your opinion of the condition of this foot when you first saw it, when he first brought it to you on April 9th, as to how serious it was; in other words, I note on the card you have marked injury, on Exhibit A, not serious, and followed that with a question mark. Explain that?

"*A.* I will explain the question mark by saying it might turn out to be serious if not taken care of properly.

"*Q.* Was the condition of the toe—in your experience as a surgeon you would have considered it a simple matter to treat had you had ample opportunity?

"*A.* If he had returned the following day and followed the treatment up, it would have been a simple matter.

"*Q.* Are you sure he understood your instruction that he was to return, did you make that instruction sufficiently explicit, or did he express an understanding that he was to return?

"*A.* I gave him the same instruction I give to all of them. I have a big calendar with large numbers for the days, and I told him to come back, and gave him the number of the following day, and he said, 'Yes, tomorrow,' so I understand from that he would return.

"*Q.* (By Mr. Reeves). Do you know whether he understood you or not?

"*A.* No, I don't.   Of course, mentally I did not know, except he shook his head and said, 'Yes,' and said, 'tomorrow.'

"*Q.* You say with proper treatment he would have got along all right?

"*A.* So far as I know.

"*Q.* You have no assurance of that?

"*A.* No.

"*Q.* His toe was in bad condition on that day?

"*A.* It was as marked on that card, not serious with a question mark.

"*Q.* The question mark you said that it stood a chance to become serious?

"*A.* It might, yes.

"*Q.* You could not say to us that there was any assurance that would have been a success even though he had come back the next day?

"*A.* I could not state it as a fact, but my experience is it would have been; I think it would have been.

"*Q.* Dr. Hodgen, isn't it equally true any abrasion or any scratch or any cut would stand in precisely the same relation; if not taken care of, might result in practically anything?

"*A.* The same condition comes every time there is an abrasion of the skin.   In that condition you might get an infection and you might not.   He got an infection; how he got that infection I don't know."

We think this testimony discloses three things: *First,* that it is not established that the doctor and claimant understood each other as to when he was to come back for treatment; that it cannot be said he refused treatment; *second,* that claimant was not made to understand the importance of coming back for further treatment; and, *third,* that it cannot be said if he had received further treatment, he would have escaped infection and the need of having his toe amputated.   We have the opinion of but one doctor, and he is not at all confident that amputation could have been avoided if his directions had been followed.   It is clear that if there had been no accident, there would have been no infection and no amputation, but it is

not equally clear that, the accident having occurred, amputation would have been avoided if claimant had returned to the doctor as requested.

The cases cited by counsel have been examined. We think they are not controlling of the instant case. While not on all fours, the recent cases handed down by this court of *Hills* v. *Oval Wood Dish Co.*, 191 Mich. 411 (158 N. W. 214); *Bruce* v. *Taylor & Maliskey,* 192 Mich. 34 (158 N. W. 153); and *Ramlow* v. *Moon Lake Ice Co.*, 192 Mich. 505 (158 N. W. 1027), may well be consulted.

The award is affirmed, with costs in favor of the claimant.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.