KLEIN *v.* LEN H. DARLING CO.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—ACCIDENT —MENTAL AND NERVOUS SHOCK.

Where an employee, while in a weakened and nervous condition, received a mental and nervous shock as the result of an accident to a fellow employee at his hands,

On what constitutes an "accident" or "personal injury" within the meaning of the workmen's compensation acts, see notes in L. R. A. 1916A, 29, 227; L. R. A. 1917D, 103; L. R. A. 1918F, 867.

his death in less than three weeks as the result of said shock is *held*, to have been accidental within the meaning of the workmen's compensation act, although he suffered no external physical injury.

Certiorari to Industrial Accident Board. Submitted October 4, 1921. (Docket No. 1.) Decided March 30, 1922.

Doris Klein and another presented their claim for compensation against Len H. Darling Company for the accidental death of their decedent in defendant's employ. From an order awarding compensation, defendant and the Hartford Accident & Indemnity Company, insurer, bring certiorari. Affirmed.

*Kerr & Lacey*, for appellants.

*Baldwin & Alexander*, for appellees.

MOORE, J. Otto Klein, husband and father of appellees, was in the employ of Len H. Darling Company, who manufacture separators for batteries. Part of his time he looked after the treating of wood separators. The treatment was accomplished by boiling the wood in a solution of caustic soda and sulphuric acid. Mr. Klein quit work January 3, 1920, and died on January 15, 1920. His widow wrote to the industrial accident board, and to defendant company to the effect that her husband died January 15, 1920, "from acid poisoning, from acid inhaled and absorbed on account of lack of proper ventilation equipment while at work."

On February 4, 1920, Mrs. Klein gave written notice of the injury and claim for compensation in which it was said:

"His death was caused by acid poisoning from acid inhaled and absorbed during his work treating materials for storage batteries."

On April 20, 1920, arbitration proceedings were held, at which time appellee for the first time advanced the theory that on December 29, 1919, while her husband was putting a register in place in a hole on the second floor of the plant where he worked, he let the register slip through the hole, and it fell, striking Merchant Harris on the head, and deceased received a shock followed by his death as a result of this accident.

Objections were interposed by counsel. Counsel for plaintiffs proposed an amendment which would cover the claim. The commissioner was of the opinion that as defendants had written the board that they were unable to find there had been any accident that the amendment would not change the status of the case, and permitted the amendment.

Appellants' objections to the testimony were that no claim for compensation had been made for such an accident within the time prescribed by law, and that appellants did not have notice of such an incident within the time prescribed by statute. The commissioner before whom the case was tried overruled these objections and the case proceeded to hearing.

In its return the board says in part:

"For a period of about 18 months previous to January 3, 1920, Otto Klein had been employed by the respondent Len H. Darling Company, a co-partnership, engaged in manufacturing automobile parts and batteries. On various previous occasions, while dipping parts of batteries in sulphuric acid and caustic soda in respondent's plant, he spilled this solution on his hands, arms and legs, causing sores on his wrists and legs. It further appears from the proofs that decedent worked in what was known as the vat room, where there were fumes from the sulphuric acid, which were injurious to decedent's health and caused him to suffer from a toxic and nervous condition. The decedent had enjoyed good health prior to his employment with respondent, but began during the year 1919

to become nervous, to lose his appetite, have headache and complain of being unable to sleep. On January 3, 1920, while putting a radiator in place in a hole on the second floor of the plant where he was working, he accidentally let the radiator slip through the hole and it fell, striking a man by the name of Merchant Harris on the head, causing a wound and rendering him unconscious. There is evidence to the effect that the decedent became excited on account of the injury to Harris, and that he at first thought he had killed Harris, but this was not the situation. The decedent went below, where Harris was, and later accompanied him to a doctor. There is testimony to the effect that the shock was so great that it affected Klein, and that he continued to be in a highly nervous state and condition from that time on, and that at night he would wake up and cry out that he had killed this man. He continued his work four days after the accident, when he was taken to his bed in a delirious condition which delirious condition continued, and grew worse until the 15th of January, when he died. He was treated by a physician, Dr. Hyde, who testified that he did not discover that the decedent had any organic troubles, and that he could not say that the poisoning from the fumes or the burns were sufficient to have caused his death. The only thing that could have caused death was the shock. * * *

"Under the medical testimony before us, it is established that death resulted from the shock, which the decedent experienced from the incident of accidentally permitting a radiator to fall, hitting his fellow workman and injuring him.

"It having been established that death resulted from shock, brought about by an accidental happening, we are confronted with the question of whether or not this is a compensable accident. We have been unable to find a case upon this question, arising under the compensation law in any State."

The board made an award in favor of the appellees.

Counsel for appellants argue many questions. We quote from the brief:

"The industrial accident board erred in holding that deceased, Otto Klein, received an accidental injury

arising out of and in the course of his employment, and that death was due and traceable thereto.   *   *   *

"Under the Michigan act, before one is entitled to compensation it must be established that an accidental injury was received.   This honorable court has passed upon this question in disposing of several important compensation cases and it was held that the provisions of the law providing compensation for personal injuries arising out of and in the course of the employment include only injuries by accident.   See *Jendrus* v. *Detroit Steel Products Co.*, 178 Mich. 265 (L. R. A. 1916A, 381) ; *Clem* v. *Chalmers Motor Co.*, 178 Mich. 340 (L. R. A. 1916A, 352) ; *Kutschmar* v. *Briggs Manfg. Co.*, 197 Mich. 146 (L. R. A. 1918B, 1133).

"There isn't any proof to show that the radiator incident and the effects thereof, if held to be an accidental injury within the meaning of the law, was the cause of death, but in addition to that contention we sincerely insist that deceased did not receive an accidental injury within the meaning of the law which would entitle his dependents to compensation," citing *Nelson* v. *Crawford*, 122 Mich. 466.

It may be well here to quote some of the testimony. The doctor who attended Mr. Klein was frank to say that he could not swear positively what caused his death, but said:

"*By Mr. Baldwin: Q.* Just one question, Doctor. This nervous condition, and the pain that was manifest in the base of this man's brain, came from the shock that he received at the time of the accident, when he dropped the radiator; that of course would be when he was in the employ of the Darling Company?

"*Mr. Kerr:* I didn't get the question.   Wait just a moment.

"*A.* I didn't just get it.

"*Q.* I say, as you understood, he was in the employ of the Darling Company when he dropped this radiator?

"*A.* Yes.

"*Q*. And that was one of the things that you saw affected his mind at the time of his illness?

"*A*. Yes. Yes, it had a marked effect upon his mind and nervous condition. * * *

"*Q*. Well, that didn't cause death, did it, Doctor?

"*A*. What was that?

"*Q*. The effect that this radiator—

"*A*. That, of itself, I don't think did. That was simply a contributory cause of his condition at the time of death, in my opinion.

"*Q*. Well now, let's see, in what way would that be a contributory cause. What portion—how would it affect the brain, Doctor?

"*A*. It would induce increased congestion and excitation of the brain.

"*Q*. What portion?

"*A*. Just as if you already had a felon on the hand, and you hurt that, you would increase the irritation and the pain, and aggravate the general condition; and that would irritate the brain, in my opinion, in the same way.

"*Q*. Well, now Doctor, do you profess to be a specialist on the brain?

"*A*. I don't.

"*Q*. Do you profess to advise accurately and definitely with reference to what effect, if any, the incident of the radiator would have upon this deceased, that is, from a medical and from a scientific standpoint?

"*A*. Why, I am no specialist at all, but I am positive as to the effect that would produce—a condition of that kind, shock to the system. I have seen that a great many times in people that were sick, if there was a nervous excitement. * * *

"*Q*. So, in this case, you are not testifying that it had been irritated or that it was irritated by this fall, are you Doctor?

"*A*. No, I am not, except that it produced an increased nervous excitation.

"*Q*. But that would not be the proximate cause of death, would it?

"*A*. Not the proximate cause; no, if it were any cause.

"*Q*. And it is possible, too, Doctor, that that fall should be dissociated—the falling of the radiator

should be dissociated absolutely with the cause of death in this case? I say, that is possible, too?

"*A.* Oh, it might be possible. I judge that it was, that it had a bearing on the case, simply from the fact that it was on his mind, and talking of that constantly in delirium, and even when awake, and he seemed very much worried and nervous over the accident. I had no doubt but what that had a bearing on his condition.

"*Q.* You mean a bearing on his nervous condition?

"*A.* On his nervous condition, and of course my opinion was that there was already a nervous irritation there.

"*Q.* What caused that?

"*A.* I don't know, if you want my opinion. That opinion was based on the history I got of the conditions under which he worked, that his health became deteriorated, and the condition developing at that time excited that and brought about the culmination.

"*Q.* Well, Doctor, can you state that that accident, that falling of a radiator—state positively—that that had anything to do with his nervous temperament? Isn't it possible in other words, that a man who was extremely nervous, and who had been in failing health for several months just gradually got worse?

"*A.* I had every reason, from the conditions existing—what I saw—to believe that did have an influence and bearing. I wouldn't say that it was not possible that it did not have, but I have no doubt in my own mind, from what I observed, that it had."

Doctors Miller and Jewett in answer to hypothetical questions expressed the opinion that the shock was the final and real cause of Mr. Klein's death.

The important question is, Did Mr. Klein come to his death by reason of an accident within the meaning of the employers' liability law? We think the case of *Nelson* v. *Crawford, supra,* cited by counsel for appellants is not in point as a reading of the opinion will show. The case before us is based upon the employers' liability statute. There are many definitions of the word accident in Words and Phrases; we quote some of them:

" 'Accidental' means 'happening by chance, or unexpectedly taking place not according to the usual course of events; casual; fortuitous. We speak of a thing as accidental when it falls to us by chance, and not in the regular course of things, as an accidental meeting, accidental advantage,' etc. *North America Life & Accident Ins. Co.* v. *Burroughs,* 69 Pa. St. 43, 51 (8 Am. Rep. 212).

"An 'accident' is an event happening without the concurrence or the will of the person by whose agency it was caused; any event that takes place without one's foresight or expectation; anything occurring unexpectedly, or without known or assignable cause; that which happens without one's direct intention. The opposite of accident is design, volition, intent. *Ætna Life Ins. Co.* v. *Vandecar,* 86 Fed. 282, 285, 30 C. C. A. 48.

"An accident is the happening of an event without the design and aid of the person, and which is unforeseen. *Paul* v. *Insurance Co.,* 112 N. Y. 472, 478 (20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758); *Williams* v. *Accident Ass'n,* 14 N. Y. Supp. 728, 730, 60 Hun, 580; *Guldenkirch* v. *Accident Ass'n,* 5 N. Y. Supp. 428, 430; *Ætna Life Ins. Co.* v. *Vandecar, supra.*

"An accident is any event which takes place without the foresight or expectation of the person acted upon or affected by the event. *Crandal* v. *Insurance Co.,* 27 Fed. 40, 42; *Ripley* v. *Assurance Co.,* 20 Fed. Cas. 823, 825; *Providence Life Ins. & Inv. Co.* v. *Martin,* 32 Md. 310, 315; *United States Mut. Acc. Ass'n* v. *Hubbell,* 56 Ohio St. 516 (47 N. E. 544, 40 L. R. A. 453).

"According to lexicographers, an accident is a sudden, unforeseen, and unexpected event. It has been held by courts, adopting this or any similar definition, that where a man is killed by robbers, this was a case of death by accident, in the sense in which that word is used in accident insurance policies. So, too, it has been held that death from a blow struck by one who has attempted to blackmail the assured was an accident covered by an accident insurance policy. In these and in all like cases in which death occurs by violent means, external to the man, and against or without intention or concurrence of will on the part of the

man, death may probably be called an accident.   A learned and laborious writer states the true rule for determining whether injuries are accidental.   With great simplicity, clearness and strength, Biddle says: 'An injury may be said objectively to be accidental, though subjectively it is not, and if it occurs without the agency of the insured it may logically be termed "accidental," though it was brought about designedly by another person.'   *Fidelity & Casualty Co.* v. *Johnson,* 72 Miss. 333 (17 South. 2, 3, 30 L. R. A. 206), citing 2 Biddle on Insurance, p. 780."

In *Johnson* v. *Casualty Co.,* 184 Mich. 406 (L. R. A. 1916A, 475), it was held, we quote from the opinion:

"It is said death as the result of ptomaine poisoning does not create liability under this policy, counsel citing *American Accident Co.* v. *Reigart,* 92 Ky. 142 (17 S. W. 280), and *Bacon* v. *Accident Ass'n,* 123 N. Y. 304 (25 N. E. 399, 20 Am. St. Rep. 748).   The first of these citations relates to the improper taking of an appeal and is not in point.   The second case is distinguishable and is not controlling.   The instant case is more like *Paul* v. *Insurance Co.,* 112 N. Y. 472 (20 N. E. 347, 3 L. R. A. 443, 8 Am. St. Rep. 758), where the liability of the company was sustained.   No question would be raised here, I take it, if the assured by mistake had taken carbolic acid, when he intended to take a helpful medicine.   *Travelers' Ins. Co.* v. *Dunlap,* 160 Ill. 642 (43 N. E. 765, 52 Am. St. Rep. 355).   Why, then, should it be said there is no liability when the assured, intending to taken nourishing food, in fact took tainted food, which resulted in ptomaine poisoning and death?   See Vance on Insurance, pp. 570, 576, and notes; Richards on Insurance Law, § 386, and notes; 1 Am. & Eng. Enc. Law (2d Ed.), pp. 272, 294; *Freeman* v. *Accident Ass'n,* 156 Mass. 351 (30 N. E. 1013, 17 L. R. A. 753); *Jiroch* v. *Insurance Co.,* 145 Mich. 375."

See, also, *Rayner* v. *Sligh Furniture Co.,* 180 Mich. 168 (L. R. A. 1916A, 22, Ann. Cas. 1916A, 386) ; *Ramlow* v. *Moon Lake Ice Co.,* 192 Mich. 505 (L. R. A. 1916F, 955) ; *Schroetke* v. *Jackson-Church Co.,* 193

Mich. 616 (L. R. A. 1917D, 64) ; Vol. 1, No. 5, Michigan State Bar Journal, p. 506 *et seq.*

In the instant case Mr. Klein could not anticipate that when he removed the register it would slip from his hand, nor could he anticipate it would hit a fellow employee, rendering him unconscious, nor could he anticipate that he himself would receive a shock which would so affect him in his weakened condition that he would, as a result thereof, pass away in less than three weeks. This, however, was just what happened in the opinion of the attending physician, and the other doctors. This, also, was the conclusion of the industrial accident board.

Some of the cases holding that the findings of fact made by the industrial accident board, acting within its powers, shall in the absence of fraud be conclusive, are *Jendrus* v. *Detroit Steel Products Co.*, 178 Mich. 273 (L. R. A. 1916A, 381, Ann. Cas. 1915D, 476) ; *Rayner* v. *Sligh Furniture Co.*, 180 Mich. 170 (L. R. A. 1916A, 22, Ann. Cas. 1916A, 386) ; *Bayne* v. *Riverside Storage Co.*, 181 Mich. 380; *Reck* v. *Whittlesberger*, 181 Mich. 468 (Ann. Cas. 1916C, 771) ; *Hills* v. *Blair*, 182 Mich. 26; *Estate of Beckwith* v. *Spooner*, 183 Mich. 332 (Ann. Cas. 1916E, 886) ; *Redfield* v. *Insurance Co.*, 183 Mich. 638; *Paton* v. *Port Huron Engine & Thresher Co.*, 214 Mich. 130.

One other question requires attention. Counsel say the compensation should not commence with January 15, 1920, we quote:

"If it be held that radiator incident and circumstances surrounding the same amounted to an accident within the meaning of the compensation law, which resulted in the death of deceased, compensation should have been directed for a period of 300 weeks from December 29, 1919."

Counsel for plaintiffs acquiesce in the change, and it may be made.

In all other respects the award is affirmed, with costs to the appellees.

CLARK, BIRD, SHARPE, and STEERE, JJ., concurred with MOORE, J.

WIEST, J. (*concurring*).    At first I was inclined to disagree with Mr. Justice MOORE, but upon reflection I am convinced he is right.    An accident happened in which the deceased was an actor, and the shock to him was so acute, and so depressed his vital forces as to kill him.    We must not overlook man's nervous system and mental makeup and their intimate relation to his vital forces.

This man died because his vital forces could not meet and withstand the acute depression occasioned by what he had done in the course of his employment. The injury to him was no less real, and fatal in its consequences, than a mortal wound.    "Accidents," within the comprehension of the workmen's compensation law, include all accidents actionable at law and all former non-actionable accidents, except in case of intentional and wilful misconduct on the part of the employee.

FELLOWS, C. J., and CLARK, J., concurred with WIEST, J.

The late Justice STONE took no part in this decision.