**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 9, 2002**

WARREN M. ROBERTSON, JR.,

    Plaintiff-Appellee,

v

                                            No. 116276

DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

In this worker's compensation case, we must determine whether the Court of Appeals properly vacated the Worker's Compensation Appellate Commission (WCAC) order affirming the magistrate's decision denying worker's compensation benefits. In part, the magistrate considered plaintiff's perceptions of an actual work event in deciding whether plaintiff had established a compensable mental disability injury under MCL 418.301(2). The Court of Appeals determined that such considerations by the magistrate were irrelevant to a mental

disability analysis.  We vacate the Court of Appeals order and remand this matter to the magistrate for analysis under the statutory framework as set forth below.

I.  FACTS AND PROCEEDINGS

Plaintiff began working for defendant employer in 1973, working at various auto assembly plant locations.  In 1984, he began working at defendant's Sterling Heights Assembly Plant. Plaintiff worked on the assembly line in the paint department on what he described as the "sealer deck or decking job." Because plaintiff was also artistically talented, he was placed in the Product Quality Improvement Partnership (PQIP) department and given the position of "artist."

In the early part of 1994, plaintiff was assigned a new supervisor, George Asher.  According to plaintiff, Asher began "needling" plaintiff to use his artistic abilities and "redo" some paintings on Asher's boat.  Plaintiff stated that he told Asher that he would do the work on his own time at his home. However, according to plaintiff, Asher insisted that it be done on company time.  Plaintiff refused to do this.

Later that year, plaintiff, on his own time, worked on a personal project for another executive employed by defendant. Plaintiff completed this project for this executive before a 1995 New Year's Eve party.  According to plaintiff, that is when "things got out of hand" with Asher.  Plaintiff stated

2

that in February 1995, Asher disciplined plaintiff for having improperly taken a personal day off two months earlier. Several days later, plaintiff and a fellow employee, Al Sipes, were called into Asher's office. Asher informed the two men that they would no longer be working in the PQIP department, and that they were to return to their previous designated positions. Plaintiff stated that he then "lost it." Specifically, plaintiff admitted that he and Asher exchanged harsh words. Asher claimed that plaintiff backed him into a corner with a 2 x 2 piece of wood and threatened him and his family. Plaintiff left work following this incident.

Later that evening, plaintiff's wife called the plant manager, Frank Slaughter, to inquire into these events. Slaughter informed plaintiff's wife that the PQIP department had been discontinued and that plaintiff had been asked to return to his previous position. Slaughter further requested that plaintiff's wife have plaintiff return to work the following Monday morning. However, when plaintiff returned to work, he was escorted from the building. Plaintiff had been given a five-day suspension for using abusive language and disorderly conduct.

Plaintiff later stated that he then went "out of control" and "would probably have killed someone" if he had not received help. He admitted himself to an in-patient mental

3

health facility that same day, and remained in the facility for about six weeks. Upon release, he continued receiving psychiatric treatment, and never returned to work. In August 1995, plaintiff filed a claim for worker's compensation benefits.

At the hearing on plaintiff's claim, he testified with regard to several precipitating factors for his hospitalization including: "Chrysler Commercial Art Supervisor wanted me to do work on his boat on company time. I refused and now I'm in trouble at work. I'm very depressed" and "I worked hard to get the status and overnight this individual [Mr. Asher] wiped it out." Additionally, Dr. Dabbagh, plaintiff's mental health provider, concluded that the conflict between defendant and Mr. Asher was the pivotal reason for plaintiff's depression and anger. In part, Dr. Dabbagh stated that

> there was a conflict between him and the supervisor, and for that reason, he was removed from his job and put on the line after about eighteen [years], if I recall, from working on that job, and that's what really basically has precipitated his episode of depression and anger.

Slaughter testified that plaintiff's transfer from PQIP to his previous position was the result of the department having been shut down. Specifically, he stated that in late 1994 and early 1995, new car launches at defendant company were going poorly. To compound this problem, employees were

4

working considerable overtime and there were significant equipment problems.  Thus, costs were high.  To solve this problem, defendant reduced overtime and cut "nonstandard" positions.  Plaintiff's position was "nonstandard"; thus, he was returned to his prior position.  Slaughter asserted that this decision was his own and that he did not consult with Asher, who confirmed that he had not been consulted about plaintiff's transfer.

The worker's compensation magistrate determined that plaintiff "failed to establish that he is or was disabled as defined by the act."  According to the magistrate, the evidence showed that "any conflict between George Asher and plaintiff was clearly the product of plaintiff's expansive mind and is a misperception." The magistrate further stated that the "credible" testimony of defendant's witnesses indicated that there had been no retaliatory intent behind plaintiff's reassignment, but instead that it represented a "simple economic business decision by upper management." Because the actual event of plaintiff's reassignment to the assembly line could not be "seen as significantly contributing to, aggravating, or accelerating plaintiff's mental disability," the magistrate concluded that plaintiff had failed to establish that he was disabled as defined by the act.  Upon review, the WCAC stated that the job transfer had

been the only actual event, and that there was no evidence of any animus on Asher's part directed toward plaintiff. Thus, the WCAC affirmed the magistrate's decision.

The Court of Appeals vacated the decision of the WCAC and remanded the case to the magistrate. *Robertson v Chrysler Corp*, unpublished order, entered January 11, 2000 (Docket No. 222363). The Court stated that the magistrate's decision that the actual work event did not significantly contribute to or aggravate plaintiff's mental disability was erroneous because it "appears to have been influenced by his findings that the plaintiff misperceived the reason for the reassignment, and that the reassignment was the result of business considerations and was not retaliatory." In the view of the Court of Appeals, "whether plaintiff correctly or incorrectly perceived or interpreted the events at work is irrelevant, as is the existence of a legitimate business reason for the reassignment." While such a conclusion is consistent with a previous decision of this Court, we believe that decision wrongly interpreted Michigan law and must be overruled.

## II. STANDARD OF REVIEW

Whether a worker's compensation claimant's perceptions of actual events of employment are to be considered in deciding whether a claimant has established a compensable mental disability under MCL 418.301(2) is a matter of statutory

6

interpretation. Matters of statutory interpretation are questions of law. *In re MCI Telecom*, 460 Mich 396, 413; 516 NW2d 164 (1999). This Court reviews questions of law under a de novo standard of review. *DiBenedetto v West Shore Hospital*, 461 Mich 394, 401; 605 NW2d 300 (2000).

### III. DISCUSSION

### A. DEVELOPMENT OF THE LAW

From its inception in 1912, Michigan's worker's compensation system has provided benefits for employees who are injured in the course of their employment. The initial worker's compensation act, however, did not expressly provide compensation for employees who suffered mental disabilities.[1] Despite this, our Court determined that coverage existed for mental disability injuries because such injuries were merely a variant of personal injury within the scope of the act. See, e.g., *Klein v Len H Darling Co*, 217 Mich 485; 187 NW 400 (1922).[2] Thus, if the mental disability arose out of, and in

---

[1]   The initial version of the worker's compensation statute, compiled at 1915 CL 5431, provided in part:

> If an employee . . . receives a personal injury arising out of and in the course of his employment by an employer . . . , he shall be paid compensation in the manner and to the extent hereinafter provided . . . .

[2]   Prior to *Klein*, this Court decided *LaVeck v Parke, Davis & Co*, 190 Mich 604; 157 NW 72 (1916), and *Schroetke v Jackson-Church Co*, 193 Mich 616; 160 NW 383 (1916), two cases

(continued...)

7

the course of, an employee's employment, that employee would be covered under the act.

This can first be seen in *Klein* where the employee died as a result of severe emotional shock experienced after he accidentally dropped a radiator on the head of a co-worker. *Id.* at 487. The decedent believed, erroneously, that he had killed the other worker, and this belief caused him such mental strain that he lapsed into delirium and died. *Id.* at 488. This Court held that the shock received by the decedent from witnessing this injury constituted an accidental personal injury within the meaning of the worker's compensation act and

---

[2](...continued)
that have sometimes been categorized as mental disability cases. See Joseph, *Causation in workers' compensation mental disability cases: The Michigan experience*, 27 Wayne L R 1079, 1095 (1981). However, upon review, it appears that these cases may be better viewed as physical disability cases. In *La Veck,* the claimant suffered a cerebral hemorrhage resulting in paralysis of one side of his body. This hemorrhage was apparently caused by heat and overexertion, coupled with arterial sclerosis. *La Veck, supra*, at 605. In *Schroetke,* the deceased worked as a night watchman at the defendant's foundry and shops. *Schroetke, supra* at 617. His duties included watching for accidental fires. On the night in question, a fire broke out, and the decedent sounded the alarm. Shortly thereafter he suffered a fatal heart attack. It was determined that the physical exertion and excitement occasioned by the fire produced a nervous shock that caused his heart attack. Upon review, this Court determined that the decedent's injury was an accidental injury within the scope of the worker's compensation act. While it can be reasonably argued that these cases involved some mental component leading up to their respective injuries, the resulting compensable injury was not a mental disability, but instead a physical one.

that the claimant, the decedent's wife, therefore was entitled to compensation for his death. *Id*. at 494.

The next significant case in the development of compensable mental disabilities is *Rainko v Webster-Eisenlohr, Inc*, 306 Mich 328, 332; 10 NW2d 903 (1943). In *Rainko*, this Court expanded the scope of compensability to cases in which no outward physical injury occurred to either the employee or to another employee as in *Klein*. Specifically, this Court stated that "[i]t is not necessary to establish physical injury (resulting in) outward evidence of violence or trauma to justify an award of compensation." *Id.* at 332.

In *Carter v General Motors Corp*, 361 Mich 577; 106 NW2d 105 (1960), this Court again extended the scope of mental disability coverage. In *Carter*, the employee suffered an emotional collapse, later diagnosed as paranoid schizophrenia, resulting from accumulated stress he experienced in trying to perform his tasks on an assembly line. Upon review, this Court held that compensation could be awarded for a mental disability injury that arose out of and in the course of employment as a result merely of the effects of work place stresses on a preexisting mental weakness.

In 1978, worker's compensation coverage for mental disabilities was again broadened. In *Deziel v Difco Laboratories, Inc (After Remand)*, 403 Mich 1, 26; 268 NW2d 1

(1978), this Court adopted the "subjective causal nexus" standard to determine the compensability of a mental disability claim:

> We hold, as a matter of law, that in cases involving mental . . . injuries, once a plaintiff is found disabled and a personal injury is established, it is sufficient that a strictly *subjective* causal nexus be utilized by referees and the WCAB to determine compensability. Under a "strictly *subjective* causal nexus" standard, a claimant is entitled to compensation if it is factually established that the claimant *honestly perceives* some personal injury incurred during the ordinary work of his employment "caused" his disability. This standard applies where the plaintiff alleges a disability resulting from either a physical or mental stimulus and honestly, even though mistakenly, believes that he is disabled due to that work-related injury and therefore cannot resume his normal employment.

In a dissenting opinion, Justice Coleman criticized the majority's holding.[3] *Id.* at 46. Justice Coleman believed that the "subjective causal nexus" standard, in application, afforded "no standard at all." *Id.* at 48. In her view, "the majority's test for causal nexus would result in an award of compensation for virtually all, if not all, claims based on mental disorders." *Id.* That was so because, "[i]f the claimant perceived that the job caused the problem, *even if this were not true*, the employer would be liable."[4] *Id.*

_____

[3] Justice Coleman was joined by Justices Fitzgerald and Ryan.

[4] See also *Bentley v Associated Spring*, 133 Mich App 15,
(continued...)

10

(emphasis added).

Thus, following *Deziel,* the controlling law was that compensation for a mental disability claim would be permitted if the claimant "honestly, even though mistakenly" perceived that a disability was related to a precipitating work event.

Apparently, the Legislature was also dissatisfied with *Deziel's* "subjective causal nexus" standard. In 1980, it reacted to *Deziel* by enacting, the statutory provision currently at issue, MCL 418.301(2). *Hurd v Ford Motor Co*, 423 Mich 531, 534; 377 NW2d 300 (1985). Section 301(2) provides:

> Mental disabilities and conditions of the aging process, including but not limited to heart and cardiovascular conditions, shall be compensable if contributed to or aggravated or accelerated by the employment in a significant manner. Mental

---

[4](...continued)
20-21; 347 NW2d 784 (1984), in which the Court of Appeals asserted that the "subjective causal nexus" standard of *Deziel*

> unduly emphasizes the testimony of a lay person with an admitted psychiatric disorder over expert testimony about the actual cause of the disorder. As long as the claimant *perceives* that his disorder arises from his job, he is entitled to compensation. In view of the financial gain—sometimes very substantial—any person who files a claim based on a psychiatric disorder will have strong motives to lie about his perception. . . . The question then becomes whether that perception is "honest." The defendants argue that, under this loose standard for recovery, Michigan employers are nearly becoming general health insurers for psychiatric disabilities. This is an alarming possibility.

11

> disabilities shall be compensable when arising out of actual events of employment, not unfounded perceptions thereof.

Section 301(2) constituted a direct response to the articulation in *Deziel* of an extraordinarily broad standard for determining compensability for mental disability claims, a standard that was the culmination of more than sixty years of judicial expansion of such claims. The Legislature's swift action in this realm following *Deziel* reflected an unequivocal desire to address such expansion. As *Farrington v Total Petroleum* Inc, 442 Mich 201, 216, n 16; 501 NW2d 76 (1993), observed, the reason that the Legislature enacted MCL 418.301(2) was to "overturn or modify expansive interpretations placed upon the act by this Court."

### B. *GARDNER V VAN BUREN PUBLIC SCHOOLS*

#### 1. MAJORITY OPINION

The first case in this Court to address § 301(2) was *Gardner v Van Buren Pub Schs*, 445 Mich 23; 517 NW2d 1 (1994). Specifically, this Court granted leave to interpret, among other things, the second sentence of § 301(2). In analyzing this sentence, the *Gardner* majority explained that it was faced with the problem of distinguishing between "actual events of employment" and "unfounded perceptions thereof." *Id.* at 43. Unable to harmonize these two phrases, the majority determined that the statute only meant that actual

12

events of employment must occur as a precondition to a claim, rather than imaginary or hallucinatory ones. *Id.* at 44-46. The Court rejected any perception analysis with regard to determining the compensability of a mental disability injury.

The Court reasoned that such an analysis was inappropriate because, in many instances, individuals with mental disabilities can misperceive or altogether lose contact with reality. *Id.* at 43-44. Because "many, if not all, mental disabilities are based on 'unfounded perceptions' of 'reality' or 'actual event[s],'" the majority concluded that it would be "absurd" to prohibit "compensation for claims based on unfounded *perceptions* of actual events, as opposed to prohibiting compensation for claims based on imagined or hallucinatory events." *Id.* In the majority's view, it would make "little sense" to allow compensability for certain work-related disabilities, i.e., those arising out of actual events of employment, only to then "exclude[] the vast majority of all mental disabilities," i.e., those based on unfounded perceptions of actual events. *Id.* at 44. Thus, with regard to its interpretation of the second clause of the second sentence of § 301(2), the majority concluded that "[t]he statute, by excluding 'unfounded perceptions' of the actual events of employment, excludes [only] situations in which the claimed events never occurred, i.e., where they are imagined,

hallucinatory or delusional." *Id.* at 49.

As an additional rationale for this interpretation, the *Gardner* majority opined that its conclusion was consistent with the Legislature's invalidation of *Deziel*, which had expressly permitted compensation for imaginary or hallucinatory events.

> Courts and commentators alike realized that *Deziel's* honest perception test permit[ted] a mental disability claim to be based on imagined, hallucinatory, or delusional events. In other words, the honest perception test permits compensation to be based on "unfounded perceptions" that actual events of employment did occur. [*Gardner, supra* at 45.]

Thus, in the majority's view, *Deziel* "established in this state that even imagined, hallucinatory, or delusional events could form the basis of a compensable mental disability notwithstanding the fact that there was no causal connection between the employment and the disability." *Id.* at 46.

Thus, a claimant for mental disability benefits could secure benefits on the basis of an employment event, no matter how wrongly the event was perceived. That is, among the countless events occurring in the course of any normal work day—the interactions with supervisors and co-employees, the conversations with customers and suppliers, the mundane tasks and routines of work—any of these might serve as the basis for a mental disability claim, no matter how ordinary or

14

unexceptional, and no matter how much they were misconstrued or mischaracterized by the claimant.[5]

### 2. BRICKLEY DISSENT

In a separate opinion, Justice Brickley took issue with the interpretation that the majority accorded the "not unfounded perceptions thereof" language.[6] *Gardner, supra* at 53. He observed that the majority had interpreted the "not unfounded perceptions thereof" language as merely reiterating the requirement that actual events of employment had to have occurred. *Id.* at 53-54. In his view, such an interpretation rendered the "unfounded perceptions" language "superfluous,

---

[5] *Gardner* also addressed the first sentence of § 301(2), commonly referred to as the "significant manner" inquiry, which reads "[m]ental disabilities . . . shall be compensable if contributed to or aggravated or accelerated by the employment in a significant manner." *Id.* at 46. According to the majority, this sentence requires that the analysis of the "significance of [the actual events of employment] to the particular claimant must be judged against all the circumstances to determine whether the resulting mental disability is compensable." *Id.* at 47. The majority surmised that when assessing the *reaction* of a claimant to objectively established events, an employer must take the employee as found. *Id.* at 49, 50. We do not address this aspect of *Gardner*'s analysis in this opinion.

[6] Justice Riley wrote a separate dissenting statement, in which Justice Griffin joined, taking issue with the majority's "causal nexus between work-related incidents and their contribution to a mental disability . . . ." See *Gardner, supra* at 63. In Justice Riley's view, it was erroneous for the majority to consider *all* actual employment-related events under § 301(2). Rather, a claimant must establish not merely an actual employment event, but a "traumatic" actual employment event. *Id.* at 65.

15

nugatory, and without independent effect," violating the well-established rule of statutory construction that every word of a statute be given meaning.  *Id.* at 54.

According to Justice Brickley, the "unfounded perceptions" language referred "not to the existence of an event, but to a claimant's interpretation or perception of an actual event."  This interpretation "does not reiterate the 'actual events' requirement, but instead demands, as an independent matter and without unnecessary surplusage, that a claimant's perception of actual events not have been unfounded." *Id.*  He also explained that

> this conclusion is consistent with the Legislature's decision to abrogate the holding in *Deziel*.  The *Deziel* "subjective causal nexus" test permitted recovery if a claimant honestly perceived that mental injury resulted from an employment event.  While the majority explains that "*Deziel's* honest perception test permit[ted] a mental disability claim to be based on imagined, hallucinatory, or delusional *events*," . . . in fact *Deziel* did not address "events" but, rather, dealt exclusively with "causation" determinations. Accordingly, while the Legislature's 1982 amendment of MCL 418.301(2) . . . may have added an "actual events" requirement, its motivation was to reverse the *causation* standard created by *Deziel*. [*Gardner, supra* at 55 (emphasis in original).]

Further, Justice Brickley stressed that analysis of the second sentence of § 301(2) involved an objective inquiry.  In this regard, he stated:

> Objective analysis is reflected in the requirements that actual events of employment have

16

occurred and that a claimant's perception or interpretation of those events have been well-founded. This analysis demands both procedural and substantive objectivity. The existence of actual events and well-founded perceptions must be discerned by an objective trier of fact, not by the claimant. The standard of review is also objective—did the event actually occur, and was claimant's perception of it well founded? [*Id.* at 57.]

However, Justice Brickley emphasized that his interpretation of MCL 418.301(2) was not a purely objective approach. *Id.* He observed that § 301(2) also encompassed a subjective element of inquiry. He stated that a "subjective analysis is proper in examining a claimant's reaction to actual employment events, perceived in a well-founded manner. A claimant with a psychiatric disability cannot be expected to react to certain events, properly perceived, in a manner entirely consistent with that of a normal, healthy individual." *Id.* at 57-58. In other words, "[w]hile a claimant's *perception* of the event must be objectively well-founded, that same claimant's *reaction* to the event can be very atypical." *Id.* at 58. In Justice Brickley's view, the subjective component of § 301(2) "insures continued recognition of employers' general obligation to 'take employees as they find them.'" We believe that Justice Brickley's analysis of the statutory language is correct.

17

## C. ANALYSIS OF § 301(2)

When reviewing matters of statutory construction, this Court's primary purpose is to discern and give effect to the Legislature's intent. *Turner v Auto Club Ins Ass'n*, 448 Mich 22, 27; 528 NW2d 681 (1995). The first criterion in determining intent is the specific language of the statute. *DiBenedetto, supra* at 402. The Legislature is presumed to have intended the meaning it has plainly expressed, and if the expressed language is clear, judicial construction is not permitted and the statute must be enforced as written. *Id.* Additionally, it is important to ensure that words in a statute not be ignored, treated as surplusage, or rendered nugatory. *Hoste v Shanty Creek Management, Inc*, 459 Mich 561, 574; 592 NW2d 360 (1999). Unless defined in the statute, every word or phrase of a statute will be ascribed its plain and ordinary meaning. See MCL 8.3a. See also *Western Mich Univ Bd of Control v Michigan*, 455 Mich 531, 539; 565 NW2d 828 (1997).

Analyzing the language of the second sentence of § 301(2), we note that it contains two principal clauses. The first clause states that "[m]ental disabilities shall be compensable when arising out of actual events of employment." A review of this clause reveals that the subject, "mental disabilities," shall be compensable when they arise out of the

18

object "actual events of employment."  The noun in the phrase "actual events of employment" is "events."  This noun is qualified by two adjectives–"actual" and "employment."  This indicates that the "events" being described cannot be *any* sort of events.  Rather, they must be actual events, existing in "fact" or "reality," not delusional or imaginary, *Random House Webster's College Dictionary* (2001), and they must be connected to the claimant's employment.

However, the sentence does not end there.  It goes on to state "not unfounded perceptions thereof."  This second clause expressly sets forth an additional precondition that must be satisfied by claimants under § 301(2), namely, that the claimant's personal perception of the actual events of employment described in the preceding clause is not dispositive of his claim, but that such perception must not be "unfounded."  The word "perception" means "the act or faculty of apprehending by means of the senses or the mind; cognition; awareness," and "a single unified awareness derived from sensory processes while a stimulus is present." *Random House Webster's College Dictionary* (2001).  In turn, "apprehend" means "to grasp the meaning of; understand, esp. intuitively." *Id*.  Before one can have an awareness or understanding there must be a stimulus present.  The stimulus is a condition precedent to the perception.  For purposes of mental

19

disability claims under § 301(2), that stimulus must be the actual events of employment. Perception follows from the event, and involves separate and distinct matters of inquiry.

The specific "perception" on claimant's part required by the statute is one that cannot be "unfounded." Stated without the double negative, the perception must be "founded". "Found," the present tense of this word, means "to base; ground." *Random House Webster's College Dictionary* (2001). In turn, "base" and "ground" mean "to establish as a fact or conclusion" and "[to have] rational or factual support for one's position" respectively. *Id.* Assimilating these definitions, it is reasonable to conclude that a worker's compensation claimant's perception must be based or grounded in fact.

The final word in § 301 (2), "thereof" is also instructive of the statute's meaning. The word "thereof" is defined as "of that or it." *Random House Webster's College Dictionary* (2001). The "of that or it" in this case refers to the proceeding antecedent word "events." As already noted, these "events" are not any sort of events; rather, they are *actual employment* events. Thus, it can also be reasonably concluded that "thereof" is a reference to the preceding phrase "actual events of employment."

20

By focusing on the words "thereof" and "perceptions" in the second clause of the second sentence of § 301(2), we believe that the plain language of this provision requires a distinct analysis concerning a claimant's perception or apprehension of the actual events of employment. If the Legislature only intended that the actual events of employment be inquired into (without consideration of the claimant's perceptions of those events), then it could have simply inserted a period at the end of the first clause. It did not.[7]

---

[7] We also agree with Justice Brickley that this conclusion is consistent with the Legislature's intent to abrogate the *Deziel* holding. As stated in note 1, *Deziel* adopted the so-called 'subjective causal nexus' standard. This standard, according to the *Deziel* Court, was to be utilized *only* in deciding the third prong of a mental disability analysis, i.e., "whether the claimant's employment combined with some internal weakness or disease to produce the disability." This prong was to be analyzed *after* it was determined that: 1) the claimant was disabled, and 2) the disability resulted from a personal injury in the form of "*a precipitating, work-related event.*" *Deziel, supra* at 37 (emphasis added). Thus, *Deziel* held that a claim could be based upon an honest though mistaken perception that a work event *caused* the disability. The *Gardner* majority, however, stated that *Deziel* permitted compensation on the basis of "imaginary" or "hallucinatory" events. This is patently not the case. *Deziel's* second prong clearly requires that the disability be predicated upon "a precipitating, work-related event." Thus, the *Gardner* majority, at best, merely stated a standard, the existence of actual employment events, that was already required by *Deziel*. By doing so, it did not accomplish what the Legislature intended—the invalidation of a standard that permitted compensation on the basis of unfounded perceptions of actual events.

In rejecting any perception analysis, the *Gardner* majority observed that, in many instances, individuals with mental disabilities misperceive or altogether lose contact with reality.

> "In finding solutions to their unconscious problems, psychoneurotics and psychotics develop personality problems which make it difficult for them to adapt to reality as it is encountered by so-called 'average' or 'normal' individuals. This failure of the psychoneurotic or psychotic's reactions and adjustment mechanisms can either distort his perception of reality or, in the worst psychotic cases, cause the individual to lose contact with reality . . . ." [*Id.* at 43-44, quoting from *Deziel, supra at* 29 (Riley, J., dissenting).]

As stated previously, the *Gardner* majority surmised that it would be "absurd" to allow compensation for a mental disability injury resulting from an actual event of employment only to subsequently "exclude[] the vast majority of all mental disabilities, those based on unfounded perceptions of actual events." *Id.* at 44. Although it may be true in many instances that mentally disabled individuals will misperceive or lose contact with reality because of some underlying cognitive weakness, the Legislature clearly has the ability to define coverage under its statutes as it deems appropriate. "[O]ur judicial role precludes imposing different policy choices than those selected by the Legislature . . . ."[8]

---

[8] Further, contrary to *Gardner*'s sense of "absurdity",

(continued...)

*People v Sobczak-Obetts*, 463 Mich 687, 694-695; 625 NW2d 764

(2001).

We conclude that, to satisfy the mental disability requirements of the second sentence of § 301(2), a claimant must demonstrate: (a) that there has been an actual employment

---

[8](...continued)
it is altogether possible that the Legislature's differing treatments of physical and mental injuries, reflected principally by its separate coverage of the two under the provisions of the Worker's Disability Compensation Act, §§ 301(1) and 301(2), are a rational means of limiting an employer's worker's compensation exposure for unique types of injuries resulting from unique types of diseases. While a mental disability may be equally as disabling as a physical disability, such disabilities nonetheless may be distinctive in certain respects. An employee with a susceptibility to physical disability, for example, may be more likely to exhibit outward manifestations of his vulnerabilities, or he may be more aware of the extent of his own vulnerabilities. As a result, an employer may be in a better position to undertake reasonable precautions in an effort to protect such an employee from unsafe or threatening working conditions. On the other hand, an employee with a susceptibility to mental disability may not exhibit the same outward manifestations of his vulnerabilities, or he may be less cognizant of the extent of his vulnerabilities. By what conceivable means could an employer ever undertake to protect such an impaired employee from any employment event, no matter how innocuous or trivial, that comes to be misconstrued? Problems of proof may also conceivably have influenced the Legislature in its crafting of the statute.

The *Gardner* majority is correct that some, but not all, mental disabilities are covered by § 301(2). That the members of that majority would have drawn this coverage differently, however, is not a warrant for it to rewrite this provision. Further, it is, at the very least, subject to debate whether *Gardner*'s rendering of § 301(2), in which the employer may be held responsible for even the most trivial and ordinary workplace events, produces a less or a more "absurd" result than that produced by the statute's plain words.

23

event leading to his disability, that is, that the event in question occurred in connection with employment and actually took place; and (b) that the claimant's perception of such actual employment event was not unfounded, that is, that such perception or apprehension was grounded in fact or reality, not in the delusion or the imagination of an impaired mind.[9]

---

[9] One must be mindful that, while an incorrect perception of an actual event would not be sufficient to satisfy this portion of the statute, a correct perception of a relatively innocuous event could potentially be enough to satisfy it. This result, as already stated, is compelled by the language of § 301(2). This, however, does not mean that an innocuous or ordinary event will often be sufficient to satisfy the remaining portion of § 301(2). As Justice Brickley's dissent noted:

> While I acknowledge the probable and understandable frustration of the Court of Appeals with "ordinary daily conditions and minutiae of employment" serving as the basis for a mental disability claim, it is nevertheless clear that the Legislature has only demanded that "actual" employment events, not objectively significant, abnormal, or uncommon incidents, serve as the basis for a mental disability claim. The concerns expressed by the Court of Appeals are more properly infused and analyzed under the "significant manner" causation requirement, not the "actual events" demand of MCL 418.301(2) . . . . [*Gardner, supra* at 61, n 8.]

Indeed, there is no indication that Justice Brickley and the majority were in disagreement with regard to what he asserts in this final sentence. The majority stated that "[o]nce actual employment events have been shown to have occurred, the significance of those events to a particular claimant must be judged against all circumstances to determine whether the resulting mental disability is compensable." *Id.* at 47. Additionally, one cannot overlook that an employee's testimony concerning an actual event, as a precipitating event

(continued...)

24

To the extent that *Gardner* is inconsistent with this interpretation of § 301(2), we overrule it.

## D. OBJECTIVE STANDARD OF REVIEW

Moreover, in determining whether there has been an actual employment event leading to a mental disability, and a perception of that event that is not unfounded, the inquiry must be conducted under an objective standard.[10]  The second

_____

[9](...continued)
for a mental disability, must always satisfy traditional standards of truthfulness.  When an employee seeks compensation for an injury arising out of an innocuous or ordinary event, that employee will, of course, be required to demonstrate to the worker's compensation factfinder that such event indeed contributed to his injury in a "significant manner."

[10]  An objective standard of inquiry focuses on how a reasonable person, under like circumstances, would have viewed the actual events that occurred.  *Lowe v Estate Motors Ltd*, 428 Mich 439, 456; 410 NW2d 706 (1987).  This is different from a subjective standard in which the focus is on how a particular individual viewed such events.  *Fire Ins Exchange v Diehl*, 450 Mich 678, 685; 545 NW2d 602 (1996).

Additionally, although the perception inquiry is to be undertaken pursuant to an objective standard, we emphasize in an effort to dispel potential confusion that the "reaction" inquiry," i.e., how a potential claimant "reacts" to actual events of employment, is to be undertaken pursuant to a subjective standard.  As Justice Brickley observed, "[a] claimant with a psychiatric disability cannot be expected to *react* to certain events, properly perceived, in a manner entirely consistent with that of a normal healthy individual. . . . While a claimant's *perception* of the event must be objectively well-founded, that same claimant's *reaction* to the event can be very atypical."  *Gardner, supra* at 58.  In sum, a claimant's perception is evaluated objectively under the second sentence of § 301(2), while his subsequent reaction is evaluated subjectively under the first sentence of this
(continued...)

25

sentence of § 301(2) modifies "events" with the term "actual," and modifies "perceptions" with the term "not unfounded" (or "founded").  These modifying terms implicate objective considerations.  See, e.g., *Radtke v Everett*, 442 Mich 368, 386-387; 501 NW2d 155 (1993).  As explained previously, "actual" means existing in "fact" or in "reality," not delusional or imaginary, and "founded" means "to be based in; to be grounded in."  In turn, "based" and "grounded" respectively mean "to establish as a fact or conclusion" and "[to have] rational or factual support for one's position." By the Legislature's use of these terms in the second sentence of § 301(2), it is clear, that in determining whether actual events occurred and whether a claimant's perceptions were "founded," the factfinder must assess the factual circumstances in terms of how a reasonable person would have viewed them.[11]

_____

[10](...continued)
provision.

[11]    Application of an objective standard is also consistent with the underlying purpose of the WDCA, as reasonably inferred through its text.  These have been invariably understood to be to compensate those who are injured in the workplace if the injury arose out of the work. *Hills v Blair*, 182 Mich 20, 25; 148 NW 243 (1914) ("Under the provisions of this act, only that employee is entitled to compensation who 'receives personal injuries arising out of and in the course of his employment.'  It is to be borne in mind that the act does not provide insurance for the employed workman to compensate any other kind of accident or injury
(continued...)

26

Thus, in applying the proper statutory test, the factfinder must first determine whether actual events of employment indeed occurred. Then, in analyzing whether a claimant's perception of the actual events of employment had a basis in fact or reality, i.e., the claimant's perception was "founded", the factfinder must apply an objective review by examining all the facts and circumstances surrounding the actual employment events in question to determine whether the claimant's perception of such events was reasonably grounded in fact or reality.[12]

### E. STARE DECISIS

In partially overruling *Gardner*, we have considered the principles of stare decisis. Although application of the

---

[11](...continued) which may befall him."). It would be inconsistent with this purpose to award compensation to those whose injuries were merely *coincident* with a period of employment, but whose injuries did not "arise out of" that employment. Thus, it is not surprising that the Legislature that enacted § 301(2) sought to limit compensation to mental disabilities that arose out of actual events of employment, not to those that were attributable to the mere imaginings of the employee.

[12] This standard of review varies slightly from that articulated by Justice Brickley, namely, that a claimant's perception of the actual employment events must be "well-founded." *Gardner*, *supra* at 57. We find nothing in the language of § 301(2) that qualifies "perception" in this way. "Well-founded" evinces a standard that may be construed as more demanding than a reasonableness standard. Thus, we do not agree that the perceptions at issue must be "well-founded." Instead, all that is required is that the claimant's perception of the actual employment events be reasonably founded.

doctrine of stare decisis is generally the preferred course of action by this Court for it "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process,'" it is not an inexorable command. *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), quoting *Hohn v United States*, 524 US 236, 251; 118 S Ct 1969; 141 L Ed 2d 242 (1998). Indeed, these same values are also furthered by judicial decisions that are neutrally grounded in the language of the law, by a legal regime in which the public may read the plain words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers.[13]

---

[13] We discussed in *Robinson* the importance of the public's interest in being able to rely on the language of statutes as written:

> [I]t is well to recall in discussing reliance, when dealing with an area of the law that is statutory . . . , that it is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are. Thus, if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts. In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of

(continued...)

Stare decisis is not to be "applied mechanically to forever prevent the Court from overruling earlier erroneous decisions interpreting the meaning of statutes." *Id.* at 463.

Before this Court overrules a decision, we must make two inquiries: (a) whether the earlier decision was wrongly decided, and (b) whether overruling such decision would work an undue hardship because of reliance interests or expectations that have arisen. *Id*. at 464-68.

With regard to the first inquiry, we believe that *Gardner,* in relevant part, was wrongly decided, clearly misconstruing the plain language of § 301(2) and rendering superfluous the entire second clause of the second sentence in violation of the cardinal rule of interpretation that effect shall be given to every word, phrase, or clause of a statute. *Hoste*, supra; *People v Borchard-Ruhland*, 460 Mich 278, 285;

---

[13](...continued)
stare decisis, should overrule the earlier court's misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people's representatives. Moreover, not only does such a compromising by a court of the citizen's ability to rely on a statute have no constitutional warrant, it can gain no higher pedigree as later courts repeat the error. [*Id.* at 467-68.]

597 NW2d 1 (1999).

With regard to the second inquiry, we believe that overruling that erroneous portion of *Gardner* will not result in any interference with legitimate reliance or expectation interests. Here, we examine "whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson*, *supra* at 466. The reliance must be the sort that "causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event." *Id.* at 467. This Court's previous interpretation of § 301(2) could hardly have caused any person to conform their conduct to a particular norm. Mental disability injuries of the sort compensated by this provision arise without planning or preparation. Instead, persons entitled to compensation under § 301(2) become aware of this Court's interpretations only after they have suffered injury. Such an after-the-fact awareness does not implicate the kind of reliance or expectation interest contemplated by our stare decisis inquiry.

## IV. RESPONSE TO DISSENT

We agree with the dissent that "fundamental principles" are at issue here that distinguish our two opinions. Unlike

30

the dissent, however, we do not view these principles as relating to our alleged disregard for stare decisis, see Part III(E), but rather as relating to the dissent's determination to perpetuate a plainly flawed reading of the law apparently because it disagrees with the policies that are actually reflected in such law. Contrary to the dissent, the "fundamental principles" that we see at stake here implicate the role of this Court in the constitutional separation of powers. That is, we believe that it is the constitutional duty of this Court to interpret the words of the lawmaker, in this case the Legislature, and *not* to substitute our own policy preferences in order to make the law less "illogical".

In the present case, the dissent reads the second sentence of § 301(2) in a manner that utterly ignores the words "not unfounded perceptions thereof." The dissent interprets section § 301(2) as if these words did not exist, as if they were not there at all. The dissent ignores these words apparently because it disagrees with the limitations that these words impose upon worker's compensation benefits. Thus, the dissent chooses to amend § 301(2) by summarily reading these words out of the law. In doing so, the dissent ignores the compromises and the negotiations that may have preceded the inclusion of these words in the law, it ignores the concerns of the Legislature in avoiding abuse of the

worker's compensation system that may have motivated such language, and it ignores the majorities of each house of the Legislature, and the Governor, who approved *these* words, not those that the dissent prefers. However, our judicial role "precludes imposing different policy choices than those selected by the Legislature . . . ."[14] *People v Sobczak-Obetts*, 463 Mich 687, 694-695; 625 NW2d 764 (2001).

Nor is the dissent's stare decisis analysis persuasive. It is premised upon little more than the argument that the misreading of § 301(2) occurred eight years ago and must therefore be maintained in perpetuity. In support, the dissent merely reiterates its view that the words of the statute must be subordinated to what the dissent believes are better policy choices, in other words, *its* policy choices. The dissent offers no argument that the four words that he would strike from the law are read unreasonably by this majority, or that a reasonable alternative interpretation exists.

In support of its stare decisis argument that there are

---

[14] The dissent "question[s] whether, under the majority's approach, compensability for any mental disabilities would ever exist." To say the least, we respectfully disagree, see note 9. Compensability would exist where the Legislature has deemed there to be compensability, and it would not exist where the Legislature has not deemed there to be compensability. Whether such coverage is too broad or too narrow is not for us to decide.

"reliance" interests that must be considered, the dissent presents nothing to show that anyone in Michigan, in the eight years since *Gardner*, has conducted personal affairs in a manner that would make it unfair to overrule *Gardner*. Of course, such a showing is hardly possible, for the onset of a mental disability is unlikely to be a function of whether *Gardner* was reigning law. Rather, in lieu of such a showing, the dissent offers the novel argument that a "reliance" interest has arisen here, not because anyone has ever conducted personal affairs in accord with *Gardner*, but because *lawyers* will have to relearn the law. That, of course, would be true of *any* overruling of precedent, but this has never before been viewed as raising a "reliance" interest sufficient to preclude a plainly flawed reading of the law from being corrected. Further, we are confident that it will not take long for the legal profession in our state to comprehend an interpretation of § 301(2) in which its words mean what they say.[15]

---

[15] The dissent raises a similar non sequitur in its observation that *Gardner* should not be overruled because it engaged in the "exact debate" that we undertake in this opinion. Needless to say, a precedent would never have to be overruled if a court had not engaged in the "exact debate" at an earlier juncture. Similarly, the dissent's "legislative acquiescence" argument is merely another way of sustaining forever any precedent, no matter how wrongly decided. Such an "acquiescence" argument has been squarely rejected by this Court because it misunderstands the legislative process, and

(continued...)

33

The dissent is also badly confused in its expressions of concern about the "unwelcome practice of changing judicially established statutory interpretations with the makeup of the Court." While such a practice is indeed unwelcome, it is only through the majority's judicial approach that this practice is avoidable. It is only when words are interpreted in accord with their plain meaning, when words are not "written on water," in the words of Thomas Jefferson, that the law avoids interpretations that are a function of shifting judicial majorities and the ebb and flow of the political process. In contrast, the dissent's judicial approach, that courts may correct laws that they view as inadequate, is a prescription for "interpretations" of the law that follow the personal predilections of judges. As judges change in their views of the substantive merits of laws, so too will their "interpretations." It is only by interpretations of the law that are in accord with the words of the lawmaker—that is, interpretations in which judges look *outside* themselves for a source of law—that the decisions of courts are truly removed from the realm of politics and policymaking.

The debate between the dissent and the majority is

---

[15](...continued)
because it would accord greater weight to the silence of a subsequent Legislature than to the actual product of the Legislature that enacted a law. *Donajkowski v Alpena Power Co*, 460 Mich 243, 258-261; 596 NW2d 574 (1999).

perhaps best encapsulated by the dissent's characterization as "strange" the majority's observation that stare decisis values are furthered by

> judicial decisions that are neutrally grounded in the language of the law, by a legal regime in which the public may read the words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers.

The dissent is "puzzled" by this observation since, in its judgment, the majority here is making the words of the law the "'exclusive province' of the makeup of the bench." In response, we can offer little more than to ask the reader, and the citizens of Michigan, in evaluating these opinions, to reflect upon which circumstances are more conducive to the law becoming the "exclusive province of the makeup of the bench"—when the words, all the words, of the law are interpreted according to their reasonable meanings, or when the words of the law are discarded when they do not suit the personal preferences of judges.

The dissent may be correct that worker's compensation benefits for mental disabilities ought to be awarded on a more liberal basis than the Legislature has chosen. The dissent may also be correct that the four words that the Legislature placed in § 301(2), "not unfounded perceptions thereof," have narrowed coverage for mental disabilities more than is wise or prudent. Finally, the dissent may be correct that the law

could be enhanced by omitting these four words. However, if any of this is so, the dissenting justice has the same rights as any other citizen to "petition the government" for the redress of his grievances. As a justice, though, he is not entitled to usurp the prerogatives of the Legislature by altering the words of a statute to mean something other than what they plainly mean.

## V. CONCLUSION

We conclude that, to satisfy the mental disability requirements under the second sentence of § 301(2), a claimant must demonstrate: (a) that there has been an actual employment event leading to his mental disability, that is, that the event in question occurred in connection with employment and actually took place; and (b) that the claimant's perception or apprehension of the actual employment event was not unfounded, that is, that such perception or apprehension was also grounded in fact or reality, not in the delusion or the imagination of an impaired mind. In analyzing whether a claimant's perception of the actual events of employment had a basis in fact or reality, the factfinder must apply an objective review, that is, examine all the facts and circumstances surrounding the actual employment events in order to determine if the claimant's perception of the actual events was reasonably grounded in fact or reality. Insofar as

*Gardner* is inconsistent with these requirements, we overrule it.

Accordingly, we vacate the Court of Appeals order that vacated the WCAC's decision and remand this matter to the magistrate for analysis under the proper statutory framework.

CORRIGAN, C.J., and TAYLOR, and YOUNG, JJ., concurred with MARKMAN, J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

WARREN M. ROBERTSON,

    Plaintiff-Appellee,

v                                 No.  116276

DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

WEAVER, J. *(concurring)*.

I join all but part IV of the opinion.  Because part III already clearly explains how the *Gardner* majority[1] incorrectly construed the statute by reading the phrase "not unfounded perceptions thereof" out of the statute, I find part IV to be unnecessary.

---

[1] *Gardner v Van Buren Pub Schs,* 445 Mich 23; 517 NW2d 1 (1994)

WARREN M. ROBERTSON,

    Plaintiff-Appellee,

v                                            No. 116276

DAIMLERCHRYSLER CORPORATION,

    Defendant-Appellant.

_____

CAVANAGH, J. (*dissenting*).

    This case presents an issue of statutory interpretation that this Court analyzed and decided eight years ago: the correct interpretation of MCL 418.301(2). In *Gardner v Van Buren Pub Schs*, 445 Mich 23; 517 NW2d 1 (1994), this Court interpreted § 301(2) in accordance with the applicable rules of statutory construction and held that a compensable mental disability claim arises when an actual event of employment, not an imaginary or hallucinatory one, significantly contributes to, aggravates, or accelerates a mental disability. The majority in this case does not disturb the latter "significantly contributes" portion of the *Gardner*

holding; however, it erroneously concludes that the *Gardner* Court wrongly decided the former "actual event of employment" portion and thus overrules *Gardner* in part.  In so doing, the majority once again fails to abide by the fundamental principles of stare decisis.  I, therefore, respectfully dissent.

In myriad decisions, this Court has expressed the fundamental principles of stare decisis.  In *Boyd v W G Wade Shows,* 443 Mich 515, 525, n 15; 505 NW2d 544 (1993), this Court stated that "[u]nder the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed." Additionally, this Court has said that "[s]tare decisis is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . .  This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation."  *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365, n 17; 550 NW2d 215 (1996), quoting *Burnet v Coronado Oil & Gas Co*, 285 US 393, 406; 52 S Ct 443; 76 L Ed 815 (1932) (Brandeis, J., dissenting).  Furthermore, as the majority correctly notes, this Court has explained that it "will not overrule a decision deliberately made unless [it] is convinced not merely that the case was wrongly decided, but

also that less injury would result from overruling than from following it." *Brown* at 365, quoting *Boyd* at 524.

The majority first holds that overruling in part the *Gardner* Court's interpretation of § 301(2) is permitted because *Gardner* was wrongly decided. One would hope the majority would not jettison precedent it believed to be correctly decided, but, then again, one never knows! The majority claims that the *Gardner* interpretation makes the statutory language mere surplusage, as the partial concurrence/dissent in *Gardner* argued. The *Gardner* majority, however, engaged in the exact debate brought by this case and clearly rejected the dissent's viewpoint for numerous reasons.

First, the *Gardner* Court noted it was faced with distinguishing between "actual events of employment" and "unfounded perceptions thereof." *Id*. at 43. Explaining that almost all mental disabilities are based on unfounded perceptions of actual events, this Court correctly concluded that reading the statute as the dissent, and the majority here, suggested would lead to an absurd result.

> Thus if one reads MCL 418.301(2) as prohibiting compensation for claims based on unfounded perceptions of actual events, as opposed to prohibiting compensation for claims based on imagined or hallucinatory events, then one is left with a statute that makes little sense. Where the first part of the provision states that certain work-related mental disabilities *shall* be compensable, the last part excludes the vast

3

majority of all mental disabilities, those based on
unfounded perceptions of actual events.  What the
legislative right hand gives, the left hand takes.
This is an absurd result.   This Court has
consistently attempted to construe statutes so as
to avoid absurd results, and our construction of
this statute will be no different.  [*Id.* at 44,
emphasis in original.]

Second, the *Gardner* Court addressed what *Deziel v Difco*

*Laboratories (After Remand)*, 403 Mich 1; 268 NW2d 1 (1978),

established and § 301(2), therefore, invalidated.  The *Gardner*

decision noted that *Deziel*'s honest perception test had two

major flaws that the Legislature intended to change: (1) it

allowed a compensable disability to be based on imagined

events, and (2) it did away with any need to prove a factual

causal connection between the disability and the employment

events.  *Id.* at 45.  Clearly, then, as the *Gardner* Court

concluded, the Legislature intended to eliminate this test by

requiring objective actual events, not imagined, and a

significant causal connection.  I question whether, under the

majority's approach, compensability for any mental

disabilities would ever exist.  It is completely illogical to

conclude that an individual with a mental disability must

comply with an objective reasonableness test when the entire

basis of a mental disability is the inability to reason.

Third, the interpretation of § 301(2) in *Gardner* supports

the basic premise that employers take employees as they are.

See *Sheppard v Michigan Nat'l Bank*, 348 Mich 577, 584; 83 NW2d

4

614 (1957) (Smith, J., concurring). The *Gardner* Court correctly recognized that "[a]bsent an explicit legislative mandate" not only should this premise be followed for physical infirmities, but for mental disabilities as well. *Id.* at 48-49.

Accordingly, the *Gardner* Court deliberately held that the relevant inquiry under § 301(2) is, "Given actual events and a particular claimant, with all the claimant's preexisting mental frailties, can the actual events objectively be said to have contributed to, aggravated, or accelerated the claimant's mental disability in a significant manner?" *Id.* at 50. I continue to adhere to this Court's sound *Gardner* decision and am unconvinced that the majority's adoption of the dissent's approach to compensation for mental disabilities under the Worker's Disability Compensation Act is the correct one.[1]

Not only does the majority err by adopting the *Gardner* concurrence/dissent as the correct interpretation of § 301(2),

---

[1] Because I conclude that *Gardner* was not wrongly decided, that would end the stare decisis analysis and further analysis of whether greater harm would exist if precedent change is unnecessary. However, I refute the majority's argument that no harm will occur by overruling *Gardner* in part. Those needing to follow § 301(2) for mental disability compensation and those practicing in that area are likely well versed in the *Gardner* analysis, as it has been the established interpretation of § 301(2) for the past eight years. I, therefore, fail to see how no harm will result from overruling *Gardner* in part and instead assert that less harm would result by keeping it intact.

5

the majority also errs by failing to address the legislative response aspect of stare decisis. As mentioned, this Court in *Brown* affirmed the principle that courts should abide by precedent when the Legislature has not refuted it. The *Brown* Court stated:

> "When, over a period of many years, the Legislature has acquiesced in this Court's construction of a statute, the judicial power to change that interpretation ought to be exercised with great restraint. On more than one occasion our Court has quoted with approval the statement that stare decisis 'is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature, by its continued use or failure to change the language of the statute so construed, the power to change the law as interpreted being regarded, in such circumstances, as one to be exercised solely by the legislature.'" [*Id.* at 367-368 (citations omitted).]

The Legislature has not reacted to the *Gardner* Court's interpretation of § 301(2) in the eight years since it was decided. Thus, I would conclude that the Legislature is satisfied with the *Gardner* interpretation and the majority's new interpretation is not only incorrect, but unnecessary.[2]

For these reasons, the doctrine of stare decisis mandates *Gardner*'s reaffirmance. The majority's noble quest to right the alleged wrongs of the *Gardner* decision serves to foster an unwelcome practice of changing judicially established

---

[2] The majority opinion's section entitled, "Response to Dissent" presents no relevant or novel analysis that contradicts the sound position I stand behind today.

6

statutory interpretations with the makeup of the Court.  Also, it fosters the undesired practice of rehashing settled debates simply because the majority concludes that someone had a better argument.  This is clear because legally, nothing has changed since *Gardner* was decided, and no new arguments were presented to refute its analysis that were not already debated eight years ago.  Strangely, the majority states that stare decisis values are furthered "by judicial decisions that are neutrally grounded in the language of the law, by a legal regime in which the public may read the plain words of its law and have confidence that such words mean what they say and are not the exclusive province of lawyers."  Slip op at 24.  I am puzzled by this statement because I question whether the majority can ascertain any distinction between frowning upon decisions grounded in the plain meaning of words, but are the "exclusive province of lawyers," and supporting decisions that change an already established plain meaning, and thus are the "exclusive province" of the makeup of the bench.

Accordingly, I would abide by the *Gardner* decision and would affirm the decision of the Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.

7