*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

AGNES N. CRAMER,

Plaintiff-Appellant,

v

TRANSITIONAL HEALTH SERVICES OF
WAYNE and AMERICAN ZURICH INSURANCE
COMPANY,

Defendants-Appellees.

FOR PUBLICATION
August 26, 2021

No. 347806
MCAC
LC No. 14-000086

Before: SHAPIRO, P.J., and JANSEN and BECKERING, JJ.

SHAPIRO, P.J. (*dissenting*).

I respectfully dissent. I would vacate the magistrate's opinion and remand for a redetermination based on the standard set forth in MCL 418.301(2) that "[m]ental disabilities . . . *are compensable if contributed to or aggravated or accelerated by the employment in a significant manner*." (Emphasis added).

## I. INTRODUCTION

In the course of her work on February 20, 2012, plaintiff was on a ladder cleaning a light fixture with a wet rag when she suffered a nonfatal electrocution. Plaintiff's testimony indicates a sustained electric shock; she explained that she physically could not "let go" from the light fixture until she was thrown from the ladder. Not long after the workplace accident, she began suffering seizures. After epilepsy was ruled out by neurological testing,[1] plaintiff was diagnosed with post-traumatic stress disorder (PTSD) and conversion disorder, in which a person—due to a psychiatric rather than physical disorder—manifests and suffers from symptoms of physical illness or disorder. When conversion disorder manifests in seizures, the seizures are referred to as nonepileptic seizures. Conversion disorder, though challenging to understand, is nevertheless a

---

[1] The testing did reveal some abnormalities in plaintiff's EEG but they did not indicate epilepsy.

well-recognized and real mental illness as acknowledged by all the physicians in this case.[2] And pursuant to the statute, if plaintiff's mental disability was "contributed to or aggravated or accelerated by the employment in a significant manner," MCL 418.301(2), she is entitled to workers' compensation benefits.

In ruling that plaintiff's mental disability was not compensable, the magistrate did not apply MCL 418.301(2) as written, but instead applied a standard adopted by the workers' compensation appellate commission in *Martin v City of Pontiac Sch Dist*, 2001 ACO 118. In my view, that test is inconsistent with both the text and purpose of MCL 418.301(2) and should be rejected.

Before turning to the *Martin* test, certain facts should be reviewed. First, there is no record evidence that prior to February 20, 2012, plaintiff was diagnosed with, treated for, or suffered from PTSD, conversion syndrome or nonepileptic seizures. Second, there is no record evidence that before the workplace accident plaintiff ever suffered a seizure or displayed other symptoms of conversion disorder. Thus, by definition, these were not preexisting conditions. Third, there is no evidence that prior to her injury plaintiff ever took anytime off work due to mental illness, let alone that she was disabled. As recounted in the magistrate's opinion, plaintiff suffered through an abusive marriage and upon remarriage became estranged from several family members. However, the first marriage ended in 2006 and her conversion syndrome did not appear until after the workplace accident in 2012. There was no evidence that during that six-year period plaintiff suffered from some other disabling mental condition, displayed symptoms of some other mental illness or required time off due to mental illness. Following her 2006 divorce, plaintiff participated in counseling that ended in 2008, and the record does not indicate any other preinjury therapy or counseling. In other words, while plaintiff suffered through painful life experiences, she was never diagnosed with any serious or disabling mental illness.

Defendants did not offer the testimony of a psychiatrist, clinical psychologist or a specialist in seizure disorders. They instead presented testimony from a neurologist, whose practice focuses almost exclusively on spinal disease, and a neuropsychologist. Nearly all of their testimony concerned their conclusions that plaintiff's condition lacked an organic physical basis, i.e., her seizures were not caused by epilepsy or other physical condition, a conclusion of little, if any, consequence since conversion syndrome is the result of mental, rather than physical, pathology.

Plaintiff's treating psychologist and neurologists[3] diagnosed her with nonepileptic seizures. They further testified that plaintiff's seizures are disabling and that the primary cause of her illness was her electrocution injury at work and its accompanying trauma.

---

[2] "Conversion disorder is a disorder in which a person experiences blindness, paralysis, or other symptoms affecting the nervous system that cannot be explained solely by physical illness or injury. Symptoms usually begin *suddenly* after a period of emotional or physical distress or psychological conflict." (http://rarediseases.info.nih.gov/diseases/6191/conversion-disorder, accessed August 23, 2021) (emphasis added).

[3] Dr. Gregory Barkley is board certified in both neurology and neurophysiology and was vice-chair of the department of neurology at Henry Ford Hospital for 10 years. Dr. Mariana Spanaki-

With that factual background, I turn to the *Martin* test.

## II. MCL 418.301(2) AND THE *MARTIN* TEST

The *Martin* test, which the magistrate concluded was controlling, was adopted by the commission in 2001. It has never been adopted in a published decision, and it is plainly inconsistent with the language of the Worker's Disability Compensation Act of 1969 (WDCA), MCL 418.101 *et seq*. MCL 418.301(2) provides:

> (2) *Mental disabiliti*es and conditions of the aging process, including but not limited to heart and cardiovascular conditions and degenerative arthritis, *are compensable if contributed to or aggravated or accelerated by the employment in a significant manner*. Mental disabilities are compensable if arising out of actual events of employment, not unfounded perceptions thereof, and if the employee's perception of the actual events is reasonably grounded in fact or reality. [Emphasis added.]

The only portion of the statute at issue in this case is the requirement set forth in the emphasized language that when the claimed disability concerns mental disability, the workplace injury must have "contributed to or aggravated or accelerated [that disability] in a *significant* manner." MCL 418.301(2) (emphasis added).

Whether one agrees with the *Martin* test or not as a matter of policy, it is clear that the test is not derived from the text of the statute. To the contrary, the *Martin* test is wholly a creation of the commission, and it was adopted without formal rulemaking under delegated authority pursuant to the Administrative Procedures Act, MCL 24.201 *et seq*. See *Fisher v Kalamazoo Regional Psychiatric Hosp*, 329 Mich App 555, 561; 942 NW2d 706 (2019) (holding that the commission exceeded its authority by creating a requirement not authorized by the WDCA or a promulgated rule). And much as in *Fisher*, the commission adopted the *Martin* test with minimal analysis and no authority directly supporting it.

*Martin*'s discussion of the meaning of the word "significant" as used in MCL 418.301(2) is minimal despite the fact that it was the central issue in that case. The entire analysis is provided in a single paragraph. See *Martin*, 2001 ACO 118 at 10-11. More problematic is the commission's conclusion that when the Legislature used the word "significant," it really meant to say "substantial." The commission failed to adequately explain how interpreting "significant" to mean "substantial" "provides the essential framework for meeting the legislative requirement of increased contribution while maintaining flexibility and discretion," *id*. at 11, or how this approach effectuated legislative intent when the Legislature could have easily used "substantial" rather than

---

Varalas is also a board-certified clinical neurophysiologist and the medical director of the Comprehensive Epilepsy Clinic at Henry Ford Hospital which treats both epilepsy and nonepileptic seizures. Andrea Thomas is a psychologist at Henry Ford Hospital who also practices in that clinic. Each testified that the workplace injury was the primary cause of plaintiff's nonepileptic seizures and each stated that they saw no basis to suspect malingering.

"significant" in the statute. And, *Martin* failed to reference a single Michigan case in which the word "significant" when used in a statute was understood to have the same meaning as "substantial." Indeed, the commission cited only caselaw and statutes from sister states even though those states workers' compensation statutes are not substantially similar to MCL 418.301(2).[4] *Id.* at 8-10 & n 9-12.

The fact that the commission could not find a single case anywhere in the country that defined "significant" as equivalent to "substantial" in the context of workers' compensation claims did not dissuade *Martin* from concluding exactly that. In doing so, *Martin* ignored the Supreme Court's cautionary statement that "this Court need not hone the analytical knife sharper than the statutory language requires." *Gardner v Van Buren Pub Schs*, 445 Mich 23, 48; 571 NW2d 1 (1994), overruled on other grounds by *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002).

As noted by a different panel of the commission in *Taig v General Motors*, 2006 Mich ACO 134 at 13, the *Martin* test effectively requires that the claimant provide that the workplace was the "most significant" cause of the disability. This inserts the word "most" into the statute despite the Legislature's choice not to do so. This essentially raised the causation requirement to one more demanding than the proximate cause standard used in tort cases. But there is nothing in the statute that indicates that contributing "in a significant manner" means that the contributor must be the sole or most significant cause. Not only does *Martin* require a twisting of the meaning of the word "significant," it also requires that we ignore the statute's use of the terms "contribute to" or "aggravated or accelerated by the employment." MCL 418.301(2). As *Taig* explained:

> [*Martin*] creates a legal standard far a field [sic] from the one envisioned by MCL 418.301(2). *Martin* fails to recognize that there can be more than one significant contributing factor in a compensable condition. . . .
>
> * * *
>
> . . . [I]f the work-related conditions are found not to have aggravated the condition "in a significant manner" because some other condition is more significant, this is legal error because it alters the legislative scheme of "in a significant manner" into requiring the employment conditions be "the most significant" cause of the injury before it will be found to be compensable. This is

---

[4] The commission relied on: an Oregon statute (and caselaw interpreting it) that required the work injury to "be the major contributing cause," Or Rev Stat Ann § 656.005(b) (1997), which is obviously a very different standard than the one defined in MCL 418.301(2); a New York statute that uses the term "substantially" to define its standard, NY CLS Work Comp § 15(8)(d) (1999); Pennsylvania caselaw that applies a "substantial contributing factor" test, *McCloskey v Workmen's Compensation Appeal Bd*, 501 Pa 93 (1983); and a Wyoming statute that bars compensation for preexisting conditions, Wyo State §§ 27-14-102(a)(xi)(F) (Supp 1995), while noting that Wyoming courts have concluded that compensation is due if "work effort contributed to a material degree to the precipitation, aggravation or acceleration of the existing condition." *Lindbloom v Teton Intern*, 684 P2d 1388, 1389-1390 (Wyo, 1984).

precisely the kind of shift in policy that is not the role of the administrative agency to make.

> . . . [T]he obligation here is to interpret MCL 418.301(2) according to its plain language. Any issues relating to the soundness of the policy underlying the statute or its practical ramifications are properly directed to the Legislature. To follow *Martin* is to "rewrite the plain statutory language and substitute our own policy decisions for those already made by the Legislature." [*Taig*, 2006 Mich ACO 134 at 11-13 (citations omitted).]

Having concocted the "substantial" causation standard, *Martin* went on to define a faulty test, limited to four factors, none of which are set forth in the statute: "1) the number of occupational and nonoccupational contributors, 2) the relative amount of contribution of each contributor, 3) the duration of each contribution, and 4) the extent of permanent effect that resulted from each contributor." *Martin*, 2011 ACO 118 at 16.

The first and third factors are inherently biased toward a finding of noncompensability. A single incident at work can never constitute more than one "contributor," and therefore will never outnumber nonoccupational contributors where there is a preexisting condition or vulnerability. Similarly, a single-event work injury, no matter how serious, can never compare in "duration" to one that is deemed to have preexisted. The other two factors, degree of contribution and degree of permanent effect, are relevant. But, as noted, in this case there is no evidence of a preexisting mental illness or a disability, let alone a permanent one. Thus, the magistrate's approach was plainly inconsistent with the statutory language providing that a mental health condition is compensable if it has been "contributed to or aggravated or accelerated by the employment." MCL 418.301(2).

In sum, the *Martin* test, at least as applied here, effectively requires that the work event be the primary or even sole cause of a disabling condition, an approach that cannot be squared with the statute. And the Martin *test* excludes consideration of other relevant factors, e.g., the temporal proximity of the disability to the workplace event, the natural history of any underlying condition, the degree to which the workplace event aggravated the preexisting mental condition and whether that condition would have necessarily worsened without the aggravation as well as other factors that may be relevant in a particular case. Counting the different contributors and their duration, especially in a case involving mental illness, is simply a game of numbers that degenerates into speculation and invites the type of conclusory opinions like those presented by defendants' medical consultants in this case.

This is not to say that the *Martin* factors should never be considered among the totality of the circumstances. In some cases, they may be relevant, but in other cases they may not be and there may be other more important factors that were not discussed in *Martin*. As noted in *Taig*:

> Even if the non-occupational contributors exceed the occupational contributors, even if a non-work-related contributor provides a greater contribution than a work-related contribution, even if the non-work contributor is of greater duration than the work-related contributor, and even if the permanent effect of a non-work related contributor exceeds the effect of the work-related contributor, it is still possible that

the work-related conditions contribute to the injury "in a significant manner" since nothing in Section 301(2) militates against the conclusion that because one contributing element to the injury is significant, some other element cannot also be significant.

. . . [I]f the work-related conditions are found not to have aggravated the condition "in a significant manner" because some other condition is more significant, this is legal error . . . . [*Taig*, 2006 Mich ACO 134 at 13.]

*Martin* paid lip service to the actual text of the statute, noting the commission's prior statement that "[a] pre-existing condition which makes a claimant more susceptible to mental injury does not act as a bar to benefit entitlement if workplace injury cause the claimant to become disabled," *Martin*, 2011 ACO 118 at 14 n 15 (quotation marks and citation omitted), but the four-factor test virtually ensures that preexisting conditions will be viewed as the most significant factor. And of course, the *Martin* approach wholly ignores the history and purpose of the worker's compensation act, which make clear that a preexisting condition is not a bar to eligibility for benefits and that mere susceptibility to injury is not grounds to deny benefits. As noted in *Samels v Goodyear Tire & Rubber Co*, 317 Mich 149, 156; 26 NW2d 742 (1947) (REID, J., plurality opinion): "Defendants claim unusual susceptibility of plaintiff. . . . Such defense is of no avail. Mere susceptibility is nowhere mentioned in the Michigan act as a matter defeating compensability."

The *Martin* test is poorly constructed, fails to consider all relevant factors and heightens consideration of factors that bias the test against compensability. Most significantly, it dramatically departs from the statute. We should reject it.

### III. CAUSATION RULING

Because I conclude that the *Martin* test is an erroneous interpretation of MCL 418.301(2) and should not be followed by this Court, I would reverse and remand for a redetermination of plaintiff's claim based on the statute as written. Alternatively, I would conclude that reversal is warranted for the magistrate's erroneous application of *Martin* and *Yost v Detroit Board of Education*, 2000 ACO 347, and that the commission erred by concluding that the magistrate's lack-of-causation conclusion was supported by competent, substantial, and material evidence.

"A claimant in a workers' compensation matter must establish a work-related disability and entitlement to benefits by a preponderance of the evidence." *Romero v Burt Moeke Hardwoods, Inc*, 280 Mich App 1, 5; 760 NW2d 586 (2008). "To establish a compensable mental disability under MCL 418.301(2), a claimant must prove: (1) a mental disability; (2) which arises out of actual events of employment, not unfounded perceptions thereof, and (3) that those events contributed to or aggravated the mental disability in a significant manner." *Zgnilec v Gen Motors Corp*, 224 Mich App 392, 396; 568 NW2d 690 (1997). Plaintiff set forth prima facie proof of causation through her treating physicians who testified that the work incident contributed in a significant manner to her PTSD, conversion disorder and seizures. However, the magistrate discredited this testimony for two reasons: (1) the treating physicians "did not compare the non-occupational stressors to the occupational stressors in plaintiff's life to determine which stressors

were the more substantive contributors" per the second *Martin* factor; and (2) they relied on the "straw that broke the camel's back" concept.

The second *Martin* factor requires a "relative comparison" of nonoccupational and occupational contributors to "find which contributors contribute the most." *Martin*, 2001 ACO 118 at 12. *Martin* provided that medical opinions are "critical" to "assist the magistrate's attempt to establish a hierarchy of contributors." *Id.* The commission explained that "[t]he magistrate may adopt a medical assessment that any contributor minimally, moderately or maximally influenced the progression of the condition." *Id.* The commission cautioned against "mere conclusory" medical opinions that a contributor is or is not significant, adding that "[f]or a medical opinion to be supportive of the magistrate's legal conclusion that contribution is significant, it must clearly express relative contribution in light of all the contributors. Thus, it is imperative for the expert to be accurately informed of all applicable factors." *Id.* at 12, n 14.

In this case, plaintiff's treating physicians were aware of the prior abuse she suffered from her ex-husband and the family stress stemming from her divorce. But given that plaintiff was functioning well at the time of the accident, they reasonably concluded that the workplace accident significantly contributed to the disorders plaintiff subsequently developed. These were not "mere conclusory" opinions, and the physicians were aware of the relevant circumstances. Plaintiff's treating psychologist, Andrea Thomas, explained that "everybody has issues, and certainly Mrs. Cramer has some issues earlier in her life, but my opinion is that she was dealing fairly well with everything prior to this incident." Thomas acknowledged that plaintiff had discussed her prior abuse and family estrangement, but she reiterated "that prior to [the workplace] incident [plaintiff] was not having seizures, she was not having any other major issues regardless of past incidents." To the contrary, plaintiff "was doing well, she liked her job, [and] she was happily married." Thomas's causation opinion was also based on the fact that plaintiff has "always been focused on the work incident" during therapy. That is, plaintiff reported dreams and flashbacks related to the electrocution, panic when she saw someone on a ladder adjusting a light, and she had never reported panic or stress related to the emotional and sexual abuse she suffered from her ex-husband.

Nonetheless, the magistrate concluded that plaintiff's treating physicians failed to comply with *Martin* because they did not "establish[] a hierarchy of plaintiff's non-occupational stressors versus her occupational stressors." This misconstrues *Martin*'s directive that it is the *magistrate*'s duty to establish a hierarchy of contributors and that medical opinions are relied on for that purpose. Setting that aside, if the *Martin* test is only a "guide," as the majority assures us, then the lack of strict compliance with *Martin* should not automatically invalidate a physician's opinion. But it is clear that the magistrate used what she perceived to be a lack of compliance with *Martin*'s standards as grounds to reject the treating physicians' causation opinions.

The other flaw the magistrate found in the treating physicians' testimony was their reference (either in name or substance) to the "last-straw" concept, first discussed by the commission in *Yost*, 2000 ACO 347:

> A workplace contribution to an individual's disability is not "significant", merely because it caused a dramatic change in the claimant's status. Just because a condition changes from asymptomatic to symptomatic, or there was a specific

injury which contributed to a change, does not equate with significant contribution. Just because a claimant was functional before the workplace event and then becomes disabled after the event does not make the event significant. *The weight of the event must be compared with the severity of the claimant's pre-existing condition in order to determine significance*. If an individual has a very severe pre-existing problem, such as an advanced degenerative condition, or serious heart disease, or an extremely distraught mental persona, the workplace event must have substantial weight in order to be deemed a significant contributor. If a claimant is a walking invitation to an arthritic disability or a heart attack or a mental breakdown, due to his or her pre-existing condition, and the event at work merely pushes that individual into the disabling condition, such event is not significant. Such event is merely the last event, or "the straw that broke the camel's back." Such event is not compensable under the significant manner standard, because if it were, the standard would in essence be identical to the regular "any contribution" standard otherwise applicable in Chapter 3. *Magistrates must look beyond the fact that an employee's status may have been changed by a workplace event (which is merely evidence of workplace contribution), and look as well at the weight of the workplace event in comparison with the claimant's pre-existing health in order to make the finding concerning significant contribution*. [*Id*. at 2 n 2 (emphasis added).]

I do not believe that the mere utterance or reference to the last-straw concept provides grounds to wholly reject a physician's opinion. *Yost* explained that the onus is on the *magistrate* to consider the claimant's preexisting health and the weight of the workplace event. In this case, the magistrate overlooked that while plaintiff had prior life stressors, she was happily married and had a job she enjoyed.[5] She was not in counseling and there is nothing to suggest that she had any ongoing mental health issues. Accordingly, there is no evidentiary basis for the magistrate's extraordinary finding that plaintiff was "so close to disability that a significant contribution from the electrical shock and fall was virtually impossible." As to the weight of the workplace event, plaintiff described a sustained electrical shock before being thrown from a ladder and hitting her head and shoulder. It is recognized that electrical injuries and the related trauma may lead to PTSD and conversion order,[6] and plaintiff's physicians believed that this occurred here. If the workplace

---

[5] According to her testimony, plaintiff worked her entire adult life, and defendants have not presented evidence to the contrary. She was hired by defendant Transitional Health as a dietary manager. Previously she had worked as a manager at Arby's and as food service director of a high school. Prior to the electrocution incident, she had not missed anytime from work.

[6] "Psychiatric disorders such as . . . post-traumatic stress disorder [and] conversion disorder . . . have been reported as diseases triggered by electrical injuries." (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6876808/, accessed August 23, 2021).

accident was indeed a last event—rather than the sole cause of plaintiff's disorders—it carried significant weight.[7]

After the magistrate relied on *Martin* and *Yost* to discard the medical opinions of plaintiff's treating physicians, she accepted the causation opinions of defendants' consultants, which the commission determined provided substantial evidence for the magistrate's causation ruling. This was error.

Neither of defendants' two consultants had significant experience diagnosing or treating conversion syndrome. Dr. William Boike is a neurologist whose career has focused almost entirely on spinal injury and disease. His testimony that there was not a physical neurological basis for plaintiff's condition is of little, if any, relevance as that fact is wholly consistent, indeed essential, to the diagnosis of conversion syndrome and nonepileptic seizures. Moreover, he declined to offer an opinion about much of anything relevant to the case, conceding that he would "defer as to whether or not any psychological or psychiatric difficulties plaintiff has may or may not be related to the February injury." The majority relies on testimony from Dr. Boike suggesting that plaintiff is a conscious malinger. However, defendants' consultants did not conclude as a matter of medical opinion that plaintiff was malingering, and they agreed that conversion syndrome is an appropriate diagnosis. And while the magistrate concluded that plaintiff's conversion syndrome was not caused by occupational stressors, she did not find that plaintiff was malingering. Accordingly, it is unclear how the testimony suggesting malingering—which the majority heavily relies on—constitutes substantial evidence for the magistrate's decision.

The other defense consultant was a neuropsychologist, Dr. Manfred Greiffenstein, who, like Dr. Boike, did not request or review any of plaintiff's medical records predating her injury. His testing confirmed that plaintiff suffers from conversion disorder and psychological nonepileptic seizures. He opined, without any reference to preincident diagnosis, treatment or disability, that plaintiff had "weaknesses in her personality"[8] that had likely been there since adolescence. And, again without reference to any medical or employment records predating the incident, he vaguely concluded that the causes of her disorder are due to "the interaction between a disturbed personality and psychological stressors." In any event, he agreed that mental health treatment was in order.

---

[7] Sometimes a "last straw" is not a significant contributor but sometimes it is, especially where prior to the workplace accident there was no disability and the last event was significant. In other words, the *weight* of the "last straw" is important, not merely when it occurred. Sometimes the "last straw" is only a straw, but sometime it is a very heavy bale of hay. Further, even assuming that the worker might have had a heart attack, for example, at some undefined time in the future precipitated by nonwork activities, the statute mandates compensation when the disability was *accelerated* by the workplace injury.

[8] The vague characterization of a preexisting "weaknesses in [one's] personality" is not a diagnosis but at best a description of a preexisting vulnerability. And it is difficult to say how having weaknesses in her personality distinguishes plaintiff from nearly every other human being.

Dr. Greiffenstein dismissed any trauma from the workplace electrocution on the curious basis that if it had happened to him, he would not have been traumatized.[9] This is not factually relevant for the obvious reason that whether or not someone suffered a trauma is not determined by whether the examining doctor would personally have been traumatized. It is not legally relevant because it amounts to an argument that plaintiff's subjective reaction was out of proportion to the trauma, which runs counter to another provision of MCL 418.301(2). The statute requires that mental disabilities "aris[e] out of actual events of employment, not unfounded perceptions thereof, and [that] the employee's perception of the actual events is reasonably grounded in fact or reality." This means that the workplace event(s) that a claimant alleges caused a mental disability must be an event that objectively occurred rather than imagined by the claimant's "impaired mind." *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 753; 641 NW2d 567 (2002). However, the claimant's reaction to the event is viewed subjectively:

> [T]here is a distinction between a claimant's perception of an event and a claimant's reaction to that event, and it is only the former that is evaluated objectively. . . . [W]hile a claimant's perception of an event must be objectively based in fact, because a claimant with a psychological disability cannot be expected to react to events in the same manner as a normal, healthy, individual, the claimant's reaction may be atypical, and is therefore viewed subjectively. [*Wolf v WCAC Gen Motors*

---

[9] Having reviewed Dr. Greiffenstein's testimony, I have difficulty understanding the magistrate's conclusion that he was credible. And the magistrate's ability to determine credibility is not superior to ours as she did not hear or see his testimony but simply read the transcripts as we have. Notably, despite his testimony that "it's important to have multiple sources of information," Dr. Greiffenstein did not review nor request any of plaintiff's medical records preceding the date of her injury.

What is likely a more accurate commentary on Dr. Greiffenstein's testimony was provided by the court in *United States of America v Shields*, opinion of the United States District Court for the Western District of Tennessee, issued May 11, 2009 (Case No. 04-20254), in which the issue was whether the defendant in a murder case was mentally retarded. Federal district Judge Bernice Bouie Donald, who now sits on the Sixth Circuit Court of Appeals, characterized Dr. Greiffenstein's evaluation as "especially lacking in credibility," noting that "the problems with Dr. Greiffenstein's work are legion" and that his conduct during the evaluation was "highly inappropriate." The court further stated that "Dr. Greiffenstein proved to be a very biased witness. One could in fact be forgiven for thinking that Dr. Greiffenstein never even attempted to engage in a truly objective evaluation of Defendant, but instead undertook a results-driven evaluation designed to deliver the [desired] conclusion . . . ." The court also pointed out that Dr. Greiffenstein misrepresented to the examinee what the purpose of the interview was, and "even more troubling . . . Dr. Greiffenstein administered Defendant three tests—none of which is designed to measure IQ." The court went so far as to say that the doctor's motive for not conducting the proper tests was "readily apparent: Dr. Greiffenstein did not want to run the risk [that the results would] undermine [his client's] position." The court described Dr. Greiffenstein's conclusions as "woefully unjustified and inaccurate," and noted that he "seemed incapable of fairly identifying and assessing" the examinee.

-10-

*Corp*, 262 Mich App 1, 6; 683 NW2d 714 (2004), citing *Robertson*, 465 Mich at 754 n 10.]

In this case, defendants concede that the workplace injury actually occurred and plaintiff's perception that she suffered an electrical shock and a fall from a ladder are accurate and not the delusion of an impaired mind. That the "reaction" to that event is to be judged subjectively appears to have escaped the magistrate and defendants' consultants.

The commission's review of a magistrate's findings is deferential but not toothless:

The "substantial evidence" standard, governing the [commission's] review of the magistrate's findings of fact, provides for review which is clearly more deferential to the magistrate's decision than the de novo review standard previously employed. Nevertheless, the [commission] has the power to engage in both a "qualitative and quantitative" analysis of the "whole record," which means that the [commission] need not necessarily defer to all the magistrate's findings of fact. [*Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691, 702; 614 NW2d 607 (2000).]

To be clear, there is not a scintilla of evidence that plaintiff would have developed this syndrome had the electrocution incident not occurred. And whatever her preexisting diagnoses, there is *no* evidence that she suffered from conversion syndrome or some other disabling psychological disorder or was unable to work before that incident. It is difficult to see how plaintiff had been capable of working up until the 2012 injury if, as defendants maintain, the true cause of her condition occurred many years prior.

Defendants' consultants theorized that plaintiff's abusive first marriage that ended in 2006 and subsequent alienation from her family was the cause of her mental disability in 2012 despite the fact that she was never deemed disabled and that she nevertheless worked following her divorce, notwithstanding any residual trauma from that marriage. Defendants' consultants' suggestion that plaintiff's psychological disorders were all due to her abusive marriage amounts to nothing more than speculation in service of a predetermined conclusion. Similarly, the magistrate's opinion engages in speculation about how marital abuse and family disputes that occurred years earlier must have been the primary cause of the disability following the work injury in 2012. Moreover, the magistrate did not seem to fully grasp the nature of conversion syndrome given that much of the opinion is spent observing the lack of a *physical* cause for plaintiff's seizures. It is simply speculation to conclude that the abuse plaintiff suffered years ago is the sole or primary cause of her disability, let alone to conclude that her electrocution and fall did not even significantly contribute to plaintiff's condition and disability.

IV. CONCLUSION

There is no basis in the text of MCL 418.301(2) to require that the causal connection be closer than "contributed to . . . in a significant manner." Requiring that the workplace event be the sole cause, the sole contributor, the prime contributor, the vital contributor or other such formulation is simply a departure from the statute. *Martin*'s formulation of the standard is error. And the four-factor test it defined is of little assistance unless the goal is to avoid the payment of compensation due under the statute. Accordingly, I would reverse and remand for a

redetermination based on the statutory standard. Alternatively, I would conclude that the commission erred by concluding that the magistrate's lack-of-causation conclusion was supported by substantial, competent and material evidence.

/s/ Douglas B. Shapiro